HERTZKA & KNOWLES, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 73–2971.

United States Court of Appeals,
Ninth Circuit.

Sept. 18, 1974.

Donald D. Connors, Jr. (argued), of Brobeck, Phleger & Harrison, San Francisco, Cal., for petitioner.

William DuRoss (argued), N.L.R.B., San Francisco, Cal., for respondent.

Before KOELSCH and CHOY, Circuit Judges, and RENFREW,* District Judge.

## OPINION

CHOY, Circuit Judge:

This case arises out of a labor dispute at Hertzka & Knowles, a medium-sized architectural firm located in San Francisco. In September of 1971 its professional employees voted to have the Organization of Architectural Employees (OAE) as their bargaining agent. After months of negotiations failed to produce an agreement with management, one of the then 25 employees in the bargaining unit petitioned the National Labor Relations Board to decertify OAE. The Board set an election for December 6, 1972.

Prior to the election, management representatives spoke to the employees on several occasions. What occurred at a December 1st meeting formed the basis for OAE charges, filed with the Board after the election, that Hertzka & Knowles violated § 8(a)(1) of the National Labor Relations Act [1] by allegedly making certain threats of reprisal.

OAE lost the election by a vote of 14 against continuing representation and 11 for.

Immediately after the election, a meeting attended by both the employees and the partners of the firm produced a new plan for employee bargaining. It called for five in-house committees with each to be composed of five employees and one management representative. Each was to have a particular zone of competence—for example, employee remuneration.[2] In its charges before the Board, OAE claimed that this committee system violated § 8(a)(2) of the

---

* The Honorable Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation.

1. 29 U.S.C. § 158(a)(1). Under that subsection it is an unfair labor practice to "interfere with, restrain, or coerce" employees in the exercise of rights granted them under § 7 of the Act, 29 U.S.C. § 157. Section 7 basically insures the rights to self-organization and to engage in other concerted activity in pursuit of labor goals.

2. The five committees are: (1) Professional Stature Within the Firm; (2) Remuneration for Professional Services; (3) Minimum Standards; (4) Efficiency; and (5) Physical Environment.

Act which requires that an employer not "dominate or interfere with the formation or administration of . . . or contribute financial or other support to" any labor organization.[3]

The Board agreed, after a hearing before a trial examiner, that the employer had committed the unfair labor practices OAE charged. 206 N.L.R.B. No. 32 (1973). Its order requires Hertzka & Knowles to cease and desist from threatening its employees with reprisals and to withdraw recognition and support from and disestablish the employees' committees. Additionally, the Board set aside the decertification and called for a new election.

Hertzka & Knowles petitions here to set aside, and the Board cross-petitions to enforce, this order insofar as it pertains to the unfair labor practices.[4] We enforce the order as to the alleged threats of reprisal, but refuse to enforce that part based on the § 8(a)(2) charges.

### The § 8(a)(1) Charges

We first consider management's pre-election speeches to the employees. Section 8(a)(1) prohibits employer interference with employee rights of self-organization. Because that prohibition could facially restrict almost any employer opposition to union organization efforts, it is qualified by § 8(c) of the act[5] which, in turn, incorporates First Amendment safeguards. The subsection provides that the "expressing of any views, argument, or opinion, or the dissemination thereof" shall not be evidence of an unfair labor practice "if such expression contains no threat of re-

prisal or force or promise of benefit." The issue for us is whether Hertzka & Knowles' pre-election statements fall within the class of unprotected threats of reprisal.

■ The Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 616–620, 89 S.Ct. 1918, 23 L.Ed.2d 462 (1969), provided the standard for distinguishing between protected and unprotected speech. An employer, the Court said, is "free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union" absent a threat. Id. at 618, 89 S.Ct. 1918 at 1942.

He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to [say] close [a] plant in case of unionization. . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is . . . a threat . . ., and as such without the protection of the First Amendment.

Id. (Citation omitted.)

With this background we turn to the particular speeches which the Board found to contain threats.[6] First, at the December 1st meeting senior partner Knowles spoke to explain how he and

3. 29 U.S.C. § 158(a)(2): It provides that it shall be an unfair labor practice for an employer:
  to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board . . ., an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

4. That part of the order setting aside the election and requiring a new election is not, and could not be, before us. *See* Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); A. F. of L. v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L. Ed. 347 (1940).

5. 29 U.S.C. § 158(c).

6. The findings set forth are those which we find substantial evidence to support.

Hertzka were transferring ownership of the firm to the junior partners. During the course of explaining this complex scheme, he mentioned that the motivation was the desire to keep the business going—"we could have closed it up, but we didn't." Ekstein, an OAE officer, immediately rose and characterized this as an unlawful threat to shut the firm down should the union win the election. Angered, Knowles advanced on Ekstein and declared that in courting a union, the employees were "playing with a load- .ed stick of dynamite." After being restrained by Hertzka, Knowles then said in a low-voiced aside to the former: "Come on Wayne, we don't have to put up with this; we can close down." [7] Because of the commotion, not everyone heard the last remark, but, according to the testimony of employee Dennis Smith, at least several of those in attendance did.

█ We think that both the "loaded stick" comment and the aside to Hertzka are clearly unprotected by § 8(c) or the First Amendment. These were threats to take action solely within the power of the employer and obviously unbased on any economic predictions.[8] It is not necessary for all the employees to have heard the remarks; as long as some heard, there was a good chance of an impact upon employee free choice.[9] Nor does it matter that it was not intended that others should hear the comments,

for it is not only the subjective intent of the speaker that is significant,[10] but also the impact on the employees.

Second, at the same meeting Tobin, another management representative, expressed the view that employment at an architectural firm was "transitory" and that "when people leave Hartzka & Knowles in the future and Hartzka & Knowles is a union office, [its] people will be known as union activists and will find it very difficult to secure employment." The examiner found this to be an implied threat to blacklist those supporting the union.

█ Hertzka & Knowles claims only that it was a true statement of fact based on OAE's poor reputation in the San Francisco architectural community. The dispute is thus purely one over the inference that can be drawn from Tobin's statement—whether a prediction of fact or a threat to blacklist. The general rule is that if more than one inference can be drawn from a given set of facts, the Board's will control unless it is unreasonable.[11] Though we consider the question a close one, we cannot say it is unreasonable to conclude that, in the heat of a decertification campaign, reference to "transitory" employment and the difficulty in finding employment elsewhere are implied threats to blacklist. See Coca Cola Bottling Co., 188 N. L.R.B. 590 (1971).[12]

---

7. So the examiner found. Knowles denies saying these things, but other witnesses supported the examiner's version. In the absence of a clear preponderance of all the other evidence, we are bound by the trial examiner's findings of credibility. E. g., NLRB v. Luisi Truck Lines, 384 F.2d 842, 845–846 (9th Cir. 1967).

8. See NLRB v. Tom Wood Pontiac, 447 F.2d 383, 385–86 (7th Cir. 1971); NLRB v. River Togs, Inc., 382 F.2d 198, 200–202 (2d Cir. 1967); Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 761–762 (6th Cir. 1965).

9. See, e. g., NLRB v. Clapper's Mfg. Co., 458 F.2d 414, 417–418 (3d Cir. 1972).

10. See, e. g., NLRB v. Kaiser Agricultural Chemicals, 473 F.2d 374, 381 (5th Cir. 1973).

11. Famet, Inc. v. NLRB, 490 F.2d 293, 295 (9th Cir. 1973); NLRB v. Douglas & Lomason Co., 443 F.2d 291, 294 (8th Cir. 1971); NLRB v. Miller Redwood Co., 407 F.2d 1366, 1369–1370 (9th Cir. 1969); see NLRB v. Holly Bra, Inc., 405 F.2d 870, 872 (9th Cir. 1969).

12. Hertzka & Knowles also argues that the blacklist charge should not be upheld because it was deleted from the charges by the Board's General Counsel. While normally nonenforcement would seem required, nowhere did the employer object to the admission of evidence on the subject, nor to the variance between charge and findings. If an issue is thus fully tried without contemporaneous objection, the findings will be upheld. Rogers Mfg. Co. v. NLRB, 486 F.2d 644, 648 (6th Cir. 1973); Rea Trucking Co. v.

Third, Tobin went on to remark that if the office "turned union," it would be more difficult to find business due to the reluctance of clients to deal with a unionized architect; this, of course, would mean fewer employees. Hertzka later said much the same thing in slightly more veiled terms. The examiner found these to be implied threats to lay off union supporters.

Again, although we are troubled by this finding, we think there is substantial evidence to support it. The statement constitutes a prediction of economic consequences, but it is not, as required by *Gissel*, one "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." NLRB v. Gissel Packing Co., 395 U.S. at 618, 89 S.Ct. at 1942. Hertzka & Knowles produced no evidence of a prospective business slowdown in the event the office remained unionized. In fact, the evidence was to the contrary since the firm's business apparently increased during the 14 months OAE represented the employees. We therefore follow similar cases sustaining unfair labor practices involving unsupported predictions of company slowdown. *See, e. g.*, Amalgamated Clothing Workers v. NLRB, 424 F.2d 818 (D.C. Cir. 1970).

### The § 8(a)(2) Charges—The Committee System

When the results of the decertification election became clear on December 6, Hanna, a partner in the firm, called a meeting of both partners and professional personnel for the next morning. The meeting was opened by Hanna who commented that the eleven pro-union votes indicated a degree of dissatisfaction which had to be taken into account. He then asked for suggestions from the floor on how to accomplish a management-employee dialogue.

Employee Smith suggested the committee system previously described. The source of the idea, he later testified, was a proposal put forth by OAE during their unsuccessful negotiations with Hertzka & Knowles prior to decertification.[13] The idea of adding a management representative to the committees was Smith's; he felt it would lessen what he termed the "long, tedious process" of negotiating with management that had been experienced with OAE as the bargaining agent. Smith's motion to adopt this system was seconded by two other employees and was approved by the employees, in the examiner's words, "overwhelmingly." An employee then suggested that the partners vote on the proposal. The suggestion was enthusiastically embraced, and the proposal passed unanimously.

The committees, though at the time of the Board hearing still in a nascent state, operate in a not unusual fashion. Their purpose is to discuss and formulate proposals for changes in employment terms and conditions; in some cases, it was contemplated that proposals would have to be passed on to management. Meetings are sometimes held on company time without loss of pay. On some committees the management member votes but apparently not on others. The firm representative, like other committee members, is consulted on meeting times and participates fully in the proceedings.

The issue for our consideration is whether the employer's participation in the system's approval and operation represents an illicit degree of interference, under § 8(a)(2), with its formation and administration.

Central to the National Labor Relations Act is the facilitation of employee free choice and employee self-organization. Indeed, § 8(a)(2) is, in part, a

NLRB, 439 F.2d 1065, 1066 (9th Cir. 1971); *cf.* Golden Grain Macaroni Co. v. FTC, 472 F.2d 882, 886 (9th Cir. 1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973).

13. A similar idea was discussed at a pre-election meeting. Several Hertzka & Knowles employees invited representatives from another architectural firm to speak on a committee system in effect there.

means to that end, for it seeks to permit employees to freely assert their demands for improvements in working conditions. Literally, however, almost any form of employer cooperation, however innocuous, could be deemed "support" or "interference." Yet such a myopic view of § 8(a)(2) would undermine its very purpose and the purpose of the Act as a whole—fostering free choice—because it might prevent the establishment of a system the employees desired. Thus the literal prohibition of § 8(a)(2) must be tempered by recognition of the objectives of the NLRA.

In saying this, we are merely repeating what Senator Wagner said of § 8(a)(2) when he introduced his bill to the Senate:

> The erroneous impression that the bill expresses a bias for some particular form of union organization probably arises because it outlaws the company-dominated union. Let me emphasize that nothing in the measure discourages employees from uniting on an independent—or company-union basis, if by these terms we mean simply an organization confined to the limits of one plant or one employer. Nothing in the bill prevents employers from maintaining free and direct relations with their workers. . . . The only prohibition is against the sham or dummy union which is dominated by the employer, which is supported by the employer, which cannot change its rules and regulations without his consent, and which cannot live except by the grace of the employer's whims.

Statutory History of the United States: Labor Organization 278–79 (R. Koretz, ed. 1970) (remarks of Feb. 21, 1935).

■ For this same reason courts have emphasized that there is a line between cooperation, which the Act encourages, and actual interference or domination considered from the standpoint of the employees, which the Act condemns. See, e. g., Federal-Mogul Corp. v. NLRB, 394 F.2d 915, 918 (6th Cir. 1968); NLRB v. Prince Macaroni Manufacturing Co., 329 F.2d 803, 809–812 (1st Cir. 1964); Chicago Rawhide Manufacturing Co. v. NLRB, 221 F.2d 165, 167–168 (7th Cir. 1955). In NLRB v. Wemyss, 212 F.2d 465 (9th Cir. 1954), we declined to approve a Board finding that an employer interfered with and dominated the administration of an in-house committee system. Judging the § 8(a)(2) issue from the subjective standpoint of the employees, we said:

> [T]he question is whether the organization exists as the result of a choice freely made by the employees, in their own interests, and without regard to the desires of their employer or whether the employees formed and supported the organization, rather than some other, because they knew their employer desired it and feared the consequences if they did not.

Id. at 471. We indicated that the employer must be shown to have interfered with the "freedom of choice" of the employees. Id. at 472.[14] The sum of this is that a § 8(a)(2) finding must rest on a showing that the employees' free choice, either in type of organization or in the assertion of demands, is stifled by the degree of employer involvement at issue. Cf. NLRB v. Keller Ladders Southern, Inc., 405 F.2d 663, 667 (5th Cir. 1968); Note, New Standards for Domination and Support Under Section 8(a)(2), 82 Yale L.J. 510, 519–32 (1973).[15]

■ Judged by this standard, we do not think there is substantial evidence, in the totality of circumstances, that

---

14. See Modern Plastics Corp. v. NLRB, 379 F.2d 201, 203–204 (6th Cir. 1967); NLRB v. Post Pub. Co., 311 F.2d 565, 569 (7th Cir. 1962); Chicago Rawhide Mfg. Co. v. NLRB, 221 F.2d at 167–168; cf. Wayside Press, Inc. v. NLRB, 206 F.2d 862, 865–866 (9th Cir. 1953).

15. Alternatively, an employer's intended attempt to suppress employee rights of self-organization might well be condemnable under § 8(a)(2).

Hertzka & Knowles violated § 8(a)(2). Unlawful support is not shown by the fact the committees meet at the firm and on firm time. *E. g.*, Coppus Engineering Corp. v. NLRB, 240 F.2d 564, 573 (1st Cir. 1957). Nor is it a weighty circumstance that Hanna called and opened the meeting at which the committee system was adopted. The idea was still that of an employee, and it was approved by the employees. There was no evidence produced at the hearing, that the employees' preference was affected by this fact. Finally, that the partners voted on the proposal is relatively meaningless; it was the result of a suggestion made by an employee and its enthusiastic acceptance by the body of employees.

The question essentially comes down to the significance of having management partners on the committees. True, this may mean bargaining is "weaker" than if there were a formally organized union. Yet this feature too was chosen by the employees, and it is one with which, for all the record shows, they are not dissatisfied. This is perhaps not unreasonable given the close contact that must exist between partners and professional associates in an architectural firm. There is no evidence, furthermore, of actual interference with the assertion of employee demands through the committees. At most, there is the management vote on some committees, and even where the partner votes, the employees can easily outvote him.

For us to condemn this organization would mark approval of a purely adversial model of labor relations. Where a cooperative arrangement reflects a choice freely arrived at and where the organization is capable of being a meaningful avenue for the expression of employee wishes, we find it unobjectionable under the Act.

The Board will prepare a revised proposed order complying with this opinion.

Enforced in part and not enforced in part.