**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NORTHEASTERN UNIVERSITY, Respondent.**

No. 78–1222.

United States Court of Appeals, First Circuit.

Argued March 14, 1979.
Decided June 26, 1979.

Richard A. Cohen, Atty., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Marjorie S. Gofreed, Atty., Washington, D. C., were on brief for petitioner.

Jerome Medalie, Boston, Mass., with whom Widett, Widett, Slater & Goldman, P. C., Boston, Mass., was on brief for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE,* District Judge.

COFFIN, Chief Judge.

The National Labor Relations Board (hereinafter the Board) petitions for enforcement of its decision and order finding the respondent university in violation of sections 8(a)(1) and 8(a)(2) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) & (2))[1] by denying its employees equal ac-

---

* Of the District of Rhode Island, sitting by designation.

1. The statute provides:
"(a) It shall be unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7,
(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . .."

cess to university facilities for the purpose of engaging in activities protected under section 7 of the Act (the 8(a)(1) access issue) and by dominating a labor organization (the 8(a)(2) domination issue). We enforce only so much of the Board's order as relates to the access issue.

The facts underlying the two violations are not in substantial dispute. Except as otherwise noted below, we rely upon the factual findings of the administrative law judge, a thorough review of the record having revealed substantial evidence to support his factual findings.

*The Domination Issue—Section 8(a)(2)*

The labor organization allegedly dominated by the university is known as the Weekly Staff Cabinet (WSC). It is a representative body consisting of fifteen employees drawn from the ranks of those "staff" (as opposed to professional) employees who are not exempt from the provisions of the wage and hour laws. The category of non-exempt or staff employees includes approximately 600 technicians, secretaries, buildings and ground personnel, and assorted other support staff workers, all of whom receive weekly paychecks. A member of the WSC is elected by his or her particular category of staff workers. Thus, there is one WSC member for each 30 to 40 secretaries, representing the secretaries' interests.

The WSC was formed in November of 1974 when the Women's Cabinet, representing secretaries, and the Technician's Committee decided to merge. The employees formed the idea of creating a unified representational body, and the university gave its blessing. The by-laws of the organization, prepared by the employees, provide that the purposes of the organization are to: promote harmonious working relationships between staff and university; provide for an exchange of information relating to staff problems; sponsor social activities; give the staff employees input into the formation or change of university policy affecting the staff; and provide a mechanism for the staff to propose changes in university practices. As originally drafted in 1974, the by-laws provided for eight members of the cabinet to be elected by the employees and seven members to be appointed by the president of the university from names suggested by the WSC. The appointment power was to be used to insure representation of a cross-section of the types of workers and ethnic groups represented. The president was also empowered to fill mid-term vacancies on the cabinet with candidates suggested by the WSC.

In early 1975, the president of the university publicly announced the "establishment" of the WSC by the university, the names of initial members,[2] that by-laws would be drafted by the employees and submitted to him for approval,[3] and that staff employees were encouraged to take their problems and suggestions to the WSC. In February, 1976, an annual election (for the 1976–1977 academic year) was held and the eight elective slots were filled. The president filled the remaining seats with candidates selected by the then-sitting WSC. In February of 1977, realizing that the method of selection of WSC members formed a part of the Board's case, the WSC chose to hold elections for all open seats. The university apparently acquiesced. Subsequent to the hearing before the ALJ, the by-laws were amended to eliminate any university participation in selection of WSC members.

WSC election procedures are managed by the sitting members of the cabinet, with university assistance. The WSC solicits nominations and gives the names of candidates to the university, which prints ballots

---

2. The record does not reveal, and the ALJ did not find, the number of initial members who were elected or appointed. The ALJ did conclude that some employees who had not run for the WSC were appointed.

3. There is no evidence in the record that submitting the by-laws for approval was necessary under any rules governing the WSC. Nor was there any evidence that subsequent amendments have involved university approval. There was uncontroverted testimony that consultation with the university during the formation of the WSC was considered a matter of courtesy and a "mere formality".

and distributes them with paychecks. Ballots are returned in the university mails and counted by WSC members not involved in the particular election (e. g., technicians count secretaries' ballots).

The WSC meets monthly during the lunch break in a room provided by the university. A limited number of staff employees are allowed to attend, but they must make a prior appointment due to space limitations. Mass meetings with the staff are not held. The WSC communicates with members of the staff through a monthly newsletter (printed at university expense) and through extensive personal contacts. A network of "contact persons" supplements the work of WSC members. Administration officials generally attend WSC meetings only when invited on the cabinet's initiative, but on at least one occasion an official requested and was granted an opportunity to appear. WSC members are not docked if a meeting runs over into work time. The WSC has no formal membership (all staff employees not represented by a traditional union are entitled to vote), no dues, and no source of income. Its expenses, including the cost of printing, supplies, and such recreational events as an annual picnic, are covered by the university through an internal charge system with a budget allotment of some $2500.

The WSC has not negotiated a formal collective bargaining agreement. It has, however, affected the terms and conditions of staff employment by formally proposing and obtaining university agreement to such matters as increased paid personal leave and improved medical benefits. It has been unsuccessful in more ambitious endeavors to obtain paid up life insurance in fifteen years and a four day work week. Central to the instant controversy is one such proposal for a 21 per cent across-the-board pay increase. After formally proposing the raise and supporting its request with data available to it, the WSC conferred extensively with the university and settled for a substantially smaller increase and an adjustment in some of the individual pay scales. Shortly after the increase went into effect, members of a secretaries' organization at Northeastern (the 9 to 5 group) circulated a petition again calling for a 21 percent increase. The ten members of the 9 to 5 organization succeeded in collecting some 200 signatures. The university then refused to accept the petition from the individual secretaries involved, stating that the WSC was the proper vehicle for wage proposals. Members of the 9 to 5 group then met with the WSC, and the latter agreed to forward the petition to the university. The WSC did not, however, endorse the petition as a second formal proposal but rather explained to 9 to 5 members that the university had adequately demonstrated salary parity with comparable institutions in the Boston area. In short, the WSC felt an identical wage proposal should not be pressed again at that time.

In addition to the above facts found by the ALJ, we find from uncontroverted testimony in the record that the president has never deviated from WSC recommendations in appointing WSC members. Elimination of the appointment system was made feasible by increased participation by all categories of employees in the WSC elections. Nevertheless, only 210 out of a possible 600 employees voted in the February, 1977, election. This limited participation does not, however, support an inference of interest in more traditional forms of union organization. Various segments of the staff have rejected traditional unions in Board-sponsored elections both before and after formation of the WSC. In a recent AFL–CIO poll, only 35 out of 325 workers polled expressed any interest in a union. The university police voted in a traditional union in a 1973 election consented to by the university. The university negotiated in good faith with the union, but the police voted it out the following year. Custodians at the university are represented by a traditional union which has negotiated a collective bargaining agreement with the university. No rival labor organization, traditional or otherwise, is waiting in the wings to replace the WSC. The ALJ expressly found that if the WSC is disestablished, the employees will have no representation at all.

Based on all of the foregoing, the ALJ concluded that "[o]verwhelming facts need no elaborate analysis." Citing only the existence of the power to appoint WSC members, "regardless of whether that power is presently being asserted", and the university's statement that it had "established" the WSC, the ALJ concluded that the WSC is as much a creature of the university as the administration's executive committee and is therefore a dominated labor organization. With great reluctance, the ALJ then imposed the only remedy allowed by the Board in domination cases, complete disestablishment of the WSC. The Board adopted the ALJ's findings and proposed order without comment.

*Reexamination of the Legal Standard*

■ It is clear that both the Board and the ALJ, in resting the finding of domination on the potential for domination, consciously refused to follow the precedents in this circuit, which require evidence of actual domination.[4] This has caused us to reexamine those precedents to see whether they were ill considered or adventitious and whether, if not when decided, circumstances have so changed as to make ancient good uncouth. Neither kind of reexamination persuades us to abandon our standard.

In the first place, our precedents not only range back over two decades but consist of a considerable battery of four cases, two presenting fact patterns we have held to be on the permissible cooperation side of the line and two which we held to amount to impermissible domination. They represent, we think, a deliberate and consistent approach over the years. The first two cases, *Coppus Engineering Corp. v. NLRB*, 240 F.2d 564 (1st Cir. 1957) and *NLRB v. Prince Macaroni Mfg. Co.*, 329 F.2d 803 (1st Cir. 1964), illustrated much of the same kind of facilitating arrangements on the part of the

employer as are found in this case—allowing use of company space for meetings, payment of shop committee members for meeting time (including time and a half for overtime meetings in *Coppus*), bearing the cost of elections; and exhibited the same hallmarks of ineffectiveness—no collective bargaining agreement or effort to obtain one, no mass meetings, no dues. In each case the employer had suggested creation of the shop committee. In *Coppus* we adopted the requirement of actual evidence of domination of *Chicago Rawhide Mfg. Co. v. NLRB*, 221 F.2d 165 (7th Cir. 1955), and found none. Chief Judge Magruder, in a concurring opinion, recognized fully that the Shop Committee may have been "a feeble instrument", 240 F.2d at 573, but that it was "not the duty of the employer nor a function of the Board to 'baby' along the employees in the direction of choosing an outside union." *Id.* at 574. *Prince* reached the same conclusion even though the Employees' Committee met only with management and the president of the company resolved any matters at impasse.

Our subsequent cases, in which we upheld Board findings of domination, were *NLRB v. Dennison Mfg. Co.*, 419 F.2d 1080 (1st Cir. 1969) and *NLRB v. Reed Rolled Thread Die Co.*, 432 F.2d 70 (1st Cir. 1970). In the former a 50 year old committee had been found to be closer to management, rarely disagreeing with it; in the latter, the plant committee, consisting of the president, general manager, and seven employees, considered only such items as the president put on the agenda. The company's response to employee suggestions was one of "bland unilateralism". *Id.* at 71.

This collection of precedents, recognizing some room for management-employee cooperation short of domination, looking to the subjective realities of domination of employee will and not just the objective poten-

4. The ALJ, near the close of proceedings before him, made clear his awareness of our leading case, *Coppus Engineering Corp. v. NLRB*, 240 F.2d 564 (1st Cir. 1957), and indicated how he would distinguish it "if the Board's attitude towards the First Circuit decision in Copus [sic] Engineering were such as to permit me as

a Board Administrative Law Judge to be bound by the *Copus* decision in the First Circuit." His purported distinction, consistent with his formal ruling, was that the WSC "is legally dominated because . . . the administration has the *potential* power to name members to [it]." (Emphasis supplied.)

tialities of organizational structure seems also in harmony with the approach in other circuits. *See Hertzka & Knowles v. NLRB,* 503 F.2d 625 (9th Cir. 1974), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975); *NLRB v. Wemyss,* 212 F.2d 465 (9th Cir. 1954); *Chicago Rawhide Mfg. Co. v. NLRB,* 221 F.2d 165 (7th Cir. 1955); *NLRB v. Post Publication Co.,* 311 F.2d 565 (7th Cir. 1962); *Modern Plastics Corp. v. NLRB,* 379 F.2d 201 (6th Cir. 1967); *NLRB v. Keller Ladders Southern, Inc.,* 405 F.2d 663 (5th Cir. 1968).[5]

■ We therefore see no reason, in terms of internal coherence or divergence from the mainstream of authority, to abandon our customary standard. Indeed, we might add that, if anything, changing conditions in the labor-management field seem to have strengthened the case for providing room for cooperative employer-employee arrangements as alternatives to the traditional adversary model. *See* Note, *New Standards for Domination and Support Under Section 8(a)(2),* 82 Yale L.J. 510 (1973). We would add that if it is appropriate in any sphere to countenance other than an adversary model of labor relations, a university setting would seem to be most appropriate. *Id.* at 522–23.

*Application of the Standard*

■ Ordinarily, having found that the Board and ALJ applied the wrong standard, i. e., potential rather than actual domination, we would remand. But because of the careful job done by the ALJ in developing the facts and making critical findings, we think our task is no less clear than it was in *Coppus* and *Prince.* We proceed to examine the record to see whether this case belongs on the *Coppus-Prince* side of the line or on the *Reed-Dennison* side.

In arguing this appeal the Board stresses the factual indicia that distinguish the WSC from a traditional labor organization. We have already discussed our cases standing for the proposition that merely facilitating the operations of a labor organization—allowing meetings on company property and company time, assisting with election procedures, providing printing and secretarial services, and funding occasional social activities—does not a domination case make. Similarly, our cases establish that an organization is not per se dominated simply because it has no formal membership, no dues, no mass meetings, and no written collective bargaining agreement.

■ We add that the Board's attempt to infer the existence of "subtle domination" from management attendance at some meetings and consultation with management by individual members of the WSC does not sway us. In many of the cases cited above, management regularly attended or was even a formal part of the meetings of the labor organization under attack. *See Prince Macaroni, supra* ; *Hertzka & Knowles, supra.* In this case, the ALJ found that management attended WSC meetings only upon invitation from the employees. Moreover, the record reveals that when management representatives attended WSC meetings they were subjected to extensive grilling about the university's position on subjects of collective bargaining and were induced to provide information needed by the WSC. The record does not support the Board's suggestion that any private conferences that may have taken place (none were established before the ALJ) were more collusive than constructive.

■ Finally, the Board's reliance on the university's announcement that it had "es-

5. We recognize that early cases dealing with employer-formed labor organizations that pre-dated the NLRA are quite abrupt in their application of section 8(a)(2). *See, e.g., NLRB v. Newport News Co.,* 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219 (1939); *Bethlehem Shipbuilding Corp. v. NLRB,* 114 F.2d 930 (1st Cir. 1940). The possibility of extensive cooperation between an employer and an effective labor organization was not seriously considered when dealing with long standing, pervasively powerful company unions. We think such cases distinguishable on their facts. As the above-cited cases demonstrate, they have not been dispositive in the past in situations that do not share the same historical context of domination. Indeed, even *Bethlehem Shipbuilding* left open the question of the proper treatment of a labor organization dominated in only a "technical" sense, 114 F.2d at 941.

tablished" the WSC as evidence of domination is misplaced for two reasons. First, the ALJ made an express finding that the employees, and not the university were the impetus behind the formation of the WSC. Second, as noted in the cases cited above, there is nothing per se unlawful about an employer encouraging his employees to arrange a collective means of expression.

■ Many of these characteristics of the WSC may serve to weaken its bargaining strength as a labor organization. Some of the problem areas appear to have been improving with time.[6] As for those weakening factors that remain, they reflect employee choice of structure and practice, choices that do not suffice to support a finding of employer domination. *See Prince Macaroni, supra,* 240 F.2d at 572; *Hertzka v. Knowles, supra,* 503 F.2d at 629–30.

There remains to be considered the most serious evidence that employee free choice may not be reflected in the structure and operation of the WSC: the president's appointment power.[7] As noted above, the ALJ's opinion finds domination in the potential power to appoint, regardless of its exercise. This focus upon potential power is duplicated in the ALJ's statement of his view of the case at oral argument at the close of the hearing. Because this focus is clearly wrong, we must determine whether the record supports a finding of actual domination in the existence and use of the power. Notably, in the very discourse in which the ALJ found the potential power to dominate to be dispositive, he stated: "I do not think that [General Counsel] has proved

that [the WSC is] a dominated labor organization on the ground that he has shown that it is ineffective or has misacted in relationship to the 9 to 5 group. As a matter of fact, the way I see this issue I don't think I even have to come to that, but if I were to come to that, I would find that on the contrary, this record establishes that the Weekly Staff Cabinet is an effective labor organization in the realm of labor relations at Northeastern University." As in his formal opinion, the ALJ went on to state that the mere existence of an unexercised power in the by-laws to appoint members of the WSC established legal domination.

■ We think the ALJ's conclusion that the WSC is an effective labor organization is fully supported by the record. To a very large degree, this finding of effectiveness implies that any appointing that may have taken place in the early days of the cabinet did not affect the WSC's ability to adequately represent employees. To the extent that a finding of effectiveness does not resolve the question of possible actual domination, we note the appointment power was never used to name management's favorite but rather was uniformly used to rubber stamp the WSC's selection. Moreover, most of those selected by the WSC had demonstrated employee support by winning votes in an election. Finally, we are not convinced that even formal management minority participation on a shop committee is illegal, so long as such representation reflects the employees' free choice. *See Hertzka & Knowles, supra* (permissible for employees of architectural

6. For instance, prior to and independent of the instant proceeding, the WSC took steps to improve communication with the rank and file by soliciting grievances and by publishing self-criticisms in the newsletter.

7. We note in passing that a common sense solution to the problem, abolition of the power, would not suffice given the present state of the law. As part and parcel of a long-standing policy against shop committees (*see NLRB v. Walton Mfg. Co.,* 289 F.2d 177, 182 (5th Cir. 1961) (Wisdom, J., dissenting)), the Board applies the theory that once domination has been shown, no remedy short of complete disestab-

lishment can ever be adequate. Such is the Board's position even when the offending practice has been cured prior to the hearing in the case. Thus, we cannot rely on the abolition of the appointment power by the WSC nor fault the Board's refusal to consider the amendment to the by-laws without addressing the complex issue of the Board's choice of remedies. Because the Board's discretion in fashioning remedies is extremely broad (*see Bethlehem Shipbuilding, supra*), we decline to consider at this time the propriety of the Board's remedial policy.

firm to establish representative committee on which a partner is permanent member with voting rights); *Prince Macaroni, supra* (permissible for shop committee to hold all meetings with management actively present). We conclude that the record does not demonstrate actual domination of the WSC.[8]

*The Access Issue—Section 8(a)(1)*

The Board found that the university violated section 8(a)(1) of the Act by refusing the request of members of the 9 to 5 group to use a room in the Ell Student Center because the group intended to discuss wages and conditions of employment. There is little dispute about the facts. The Ell Student Center is available to all members of the university community provided that the function for which a room is needed is sponsored by a recognized university group. Nonstudent groups must be sponsored by a member of the university hierarchy, and the reservation form for the room must be countersigned by the sponsoring official. Such groups as the Northeastern Library Support Staff Association, a professional association, and the American Association of University Professors commonly meet in the Ell Student Center.

Members of the 9 to 5 organization, however, were unsuccessful in their attempts to reserve a room since they lacked a sponsor. After several reservation applications had been rejected, members of the 9 to 5 group met with Dean LaTorre and Vice President Curry to find out why. The university officials explained the reservation system and explained that they would not sponsor a 9 to 5 meeting. In the course of the conversation, Curry referred to 9 to 5 as a "budding labor organization." He later revealed that this characterization and his reticence to allow a 9 to 5 meeting were based upon advice of counsel admonishing the university to avoid acts that could be interpreted as recognition of the group.[9] The meeting then turned to the goals of 9 to 5 and the business that the employees wished to discuss at the meeting. Finally, Curry offered to act as sponsor himself if the employees wanted to meet as individuals and not as the Northeastern University Chapter of 9 to 5. One of the employees asked what would happen if, once the group had obtained a room with Curry's sponsorship, their meeting covered the same business as if they were meeting in the name of 9 to 5, i. e., improving the wages, hours, and working conditions of respondent's office workers. LaTorre responded, "That would be a subterfuge." The meeting then broke up.

Relying on *Trustees of Columbia University*, 225 N.L.R.B. No. 9 (1976), the Board held that the university had violated section 8(a)(1) by denying use of a room otherwise available to employee organizations solely because the employees wished to engage in activity protected by section 7 of the Act. Respondent now challenges this ruling by attacking both the facts set forth in the preceding paragraph and by alleging it has fulfilled any duty it owed the 9 to 5 group by providing alternate facilities.

---

8. We think it important to note that our holding does not irrevocably enshrine the WSC as an employee representative body at Northeastern University. First, it is only because the ALJ found the WSC is presently an effective organization that we can resolve the factual question of actual domination. Should the WSC fail in its task of expressing employee free choice or should the university utilize the WSC as a tool of an impermissible intent to hinder the free exercise of section 7 rights, the Board is free to act under section 8(a)(2). Perhaps more important, the Board is free to challenge those forms of support and assistance it considers illegal in the way the WSC functions. *See, e.g., Duquesne University*, 198 N.L.R.B. No. 117, 1972 N.L.R.B. Dec. ¶ 24514. Domina-

tion and support/assistance are two distinct violations. *NLRB v. Dennison Mfg. Co., supra*, 419 F.2d at 1082. Although we do not decide the issue, the Board may be free to consider the more limited assistance issues not raised in this proceeding. Finally, and most important, any time that 30% of the employees decide that the WSC does not reflect their free choice, they are free to obtain the Board's assistance in throwing the organization out.

9. Notably, 9 to 5 expressly disavows the status of a labor organization under section 2(5) of the Act, and the ALJ found that the group is not a labor organization for the purposes of this proceeding.

The factual issue before the ALJ was a close one and involved a resolution of narrow differences in testimony. Respondent's version of the "subterfuge" comment is that LaTorre and Curry objected only to the use of the name of an outside organization, not to the discussion of conditions of employment. The charging parties claim that both 9 to 5 and its goals were the subject of the university's discrimination. The issue was squarely framed before the ALJ, and he believed the complaining employees' version. We will not upset an ALJ's resolution of a close credibility issue. E. g., *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125 (1st Cir. 1978).

Given that the university was refusing access normally available to employees because the employees wished to engage in protected activity, we have little trouble approving the finding of an 8(a)(1) violation. Respondent's complaints that the 9 to 5 group had for years used the Womens' Center in the Ell Building (different from the Ell Student Center) for weekly lunches are of no avail. The employees sought to make use of a larger facility available for virtually any reason and respondent denied access because it objected to use for a protected reason. Such is clearly discrimination on account of exercise of protected activity. Indeed, in view of the fact that other labor organizations were allowed to use the Center, we find it difficult to understand respondent's proffered justifications for denying access to a particular group desiring to discuss terms and conditions of employment. *Trustees of Columbia University, supra,* is squarely in point. Accordingly, that portion of the Board's order requiring access to the Ell Student Center on an equal nondiscriminatory basis with other employee groups for purposes of engaging in protected activities will be enforced.

*Enforced in part, enforcement denied in part. No costs.*