12 F.3d 360
 145 L.R.R.M. (BNA) 2010, 127 Lab.Cas. P 10,985
 UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO; the
Commission of La Cosa Nostra; Anthony Salerno, also known
as Fat Tony; Matthew Ianniello, also known as Matty the
Horse; Anthony Provenzano, also known as Tony Pro; Nunzio
Provenzano, also known as Nunzi Pro; Anthony Corallo, also
known as Tony Ducks; Salvatore Santoro, also known as Tom
Mix; Christopher Furnari, Sr., also known as Christie Tick;
Frank Manzo; Carmine Persico, also known as Junior, also
known as The Snake; Gennaro Langella, also known as Gerry
Lang; Philip Rastelli, also known as Rusty; Nicholas
Marangello, also known as Nicky Glasses; Joseph Massino,
also known as Joey Messina; Anthony Ficarotta, also known
as Figgy; Eugene Boffa, Sr.; Francis Sheeran; Milton
Rockman, also known as Maishe; John Tronolone, also known
as Peanuts; Joseph John Aiuppa, also known as Joey O'Brien,
also known as Joe Doves, also known as Joey Aiuppa; John
Phillip Cerone, also known as Jackie the Lackie, also known
as Jackie Cerone; Joseph Lombardo, also known as Joey the
Clown; Angelo Lapietra, also known as Nutcracker; Frank
Balistrieri, also known as Mr. B; Carl Angelo DeLuna, also
known as Toughy; Carl Civella, also known as Corky;
Anthony Thomas Civella, also known as Tony Ripe; General
Executive Board, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America; Jackie
Presser, General President; Weldon Mathis, General
Secretary-Treasurer; Joseph Trerotola, also known as Joe T,
First Vice President; Robert Holmes, Sr., Second Vice
President; William J. McCarthy, Third Vice President;
Joseph W. Morgan, Fourth Vice President; Edward M. Lawson,
Fifth Vice President; Arnold Weinmeister, Sixth Vice
President; John H. Cleveland, Seventh Vice President;
Maurice R. Schurr, Eighth Vice President; Donald Peters,
Ninth Vice President; Walter J. Shea, Tenth Vice President;
Harold Friedman, Eleventh Vice President; Jack D. Cox,
Twelfth Vice President; Don L. West, Thirteenth Vice
President; Michael J. Riley, Fourteenth Vice President;
Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis,
Sixteenth Vice President; and Salvatore Provenzano, also
known as Sammy Pro, Former Vice President, Defendants,
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, AFL-CIO,
Defendant-Appellant.
 No. 1164, Docket 92-6256.
 United States Court of Appeals,
Second Circuit.
 Argued March 11, 1993.
Decided Dec. 15, 1993.
 
 Earl V. Brown, Jr., Washington, DC (Richard N. Gilberg, Richard M. Seltzer, Cohen, Weiss and Simon, New York City, of counsel), for defendant-appellant.
 Christine H. Chung, Asst. U.S. Atty. for the S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty. for S.D.N.Y., Steven C. Bennett, Ping C. Moy, Asst. U.S. Attys. for S.D.N.Y., New York City, of counsel), for plaintiff-appellee.
 Susan M. Jennik, Brooklyn, NY, for amicus curiae Ass'n for Union Democracy.
 Before: MAHONEY and WALKER, Circuit Judges, and SAND, District Judge.*
 MAHONEY, Circuit Judge:
 
 
 1
 The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO (the "IBT")[1] appeals from an order entered August 27, 1993 in the United States District Court for the Southern District of New York, David N. Edelstein, Judge. That order granted an application of the United States and Frederick B. Lacey, then Independent Administrator of the IBT under a consent decree (the "Consent Decree") previously entered in this case, and prospectively a member of an Independent Review Board (the "IRB") to be established pursuant to the Consent Decree, that William H. Webster be appointed as the third member of the IRB.
 
 
 2
 We affirm.
 
 Background
 
 3
 We have recounted the facts underlying this case numerous times in the past, see, e.g., United States v. IBT ("Election Rules"), 931 F.2d 177, 180-81 (2d Cir.1991), and they are described in the opinion below. See United States v. IBT ("IBT"), 803 F.Supp. 806, 807-10 (S.D.N.Y.1992). We summarize only the facts relevant to this appeal.
 
 
 4
 In June 1988, the United States brought a civil action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 (1988 & Supp. II 1990) et seq., against the IBT, its General Executive Board (the "GEB") and the members of the GEB, and the Commission of La Cosa Nostra and various alleged members of that organization. In March 1989, the parties settled the action and entered into a Consent Decree that instituted reforms of the IBT's electoral and disciplinary processes to ensure " 'that there [w]ould be no criminal element or La Cosa Nostra corruption of any part of the IBT.' " IBT, 803 F.Supp. at 807 (quoting Consent Decree). The Consent Decree initially placed responsibility for its implementation upon an Elections Officer (to supervise a direct rank-and-file secret ballot election of IBT officers for which the Consent Decree made provision), an Investigations Officer (to investigate union corruption and bring charges before the Independent Administrator), and an Independent Administrator (to exercise the disciplinary powers vested by the IBT constitution in the GEB and the general president of the IBT, and to hear charges brought by the Investigations Officer). With limited exceptions not relevant here, the authority of the Elections Officer terminated after the certification of the results of the 1991 IBT election, and the authority of the Investigations Officer and the Independent Administrator terminated on October 10, 1992, approximately nine months after that certification.
 
 
 5
 The Consent Decree also authorized the establishment of the IRB, which was to commence operations upon the expiration of the authority of the Independent Administrator and the Investigations Officer. The IRB was to consist of three members, one chosen by the Attorney General of the United States, one chosen by the IBT, and one chosen by those two designees. The Consent Decree authorizes the IRB to: (1) "hire a sufficient staff of investigators and attorneys to investigate adequately" allegations of corruption, or of domination or control of any IBT affiliate, member, or representative by any organized crime entity; (2) "exercise such investigative authority as the General President and General Secretary-Treasurer are presently authorized and empowered to exercise pursuant to the IBT Constitution"; (3) issue to the appropriate IBT entity written reports of its findings, charges, and recommendations for discipline of IBT personnel or trusteeship of IBT subordinate bodies upon the completion of its investigations; (4) monitor all matters that it has referred for action to determine whether they have been properly resolved by the appropriate IBT entity, and conduct hearings regarding any matters that it deems not to have been properly resolved; and (5) issue final, binding disciplinary decisions after such hearings, monitor the GEB's implementation of such decisions, and if dissatisfied therewith, "take whatever steps are appropriate to insure proper implementation of any such decision." The IRB is also authorized "to review any disciplinary or trusteeship decision of the [GEB], and ... to affirm, modify, or reverse any such decision."
 
 
 6
 The Attorney General appointed his designee, Frederick B. Lacey (formerly the Independent Administrator), to the IRB on March 8, 1992. The IBT appointed its designee, Harold E. Burke, then special assistant to IBT General President Ron Carey, to the IRB on April 9, 1992. Lacey and Burke began discussions and negotiations regarding the third IRB member in May 1992, but had not reached an agreement by the end of July. On July 30, 1992, during a hearing on proposed rules for the operation of the IRB, Lacey reported to Judge Edelstein the status of the negotiations regarding the third IRB member, and conveyed his belief that he and Burke had reached an impasse. Lacey then indicated that he would attempt to find a nominee of "unchallengeable, national reputation, background and experience," and if that nomination was rejected by Burke, Lacey would make an application to the court to resolve the impasse. Judge Edelstein ordered Lacey and Burke to appear on August 4, 1992 for a hearing to resolve the matter.
 
 
 7
 By letter dated July 31, 1992, Lacey proposed William H. Webster to Burke, noting Webster's background as a former Director of the Federal Bureau of Investigation, Director of the Central Intelligence Agency, and federal judge. In a letter dated August 3, 1992, Burke rejected Webster's nomination, stating that in his opinion and after reviewing the suggestion with General President Carey and others in the IBT, Webster was "not the person best-suited to the role of the third party on the IRB" because he did not have a labor background. In response, the United States and Lacey brought an application requesting the district court to address the alleged impasse concerning the appointment of the third member of the IRB.
 
 
 8
 At the August 4 hearing on the application, it became apparent that Lacey and Burke disagreed about the appropriate background for an IRB member. Lacey believed that a candidate should have "strong law enforcement, prosecutorial, and judicial experience." IBT, 803 F.Supp. at 811. Burke sought a member "who had both an understanding of labor relations and labor unions and who had [had] such responsibility for investigations of exactly the type that the IRB [was] going to be asked to investigate." In this regard, Burke had previously nominated two former Secretaries of Labor for the position. However, Burke was not unalterably committed to the position that the third member be a "labor statesman," and had also proposed the names of three former Assistant Attorneys General of the United States.
 
 
 9
 At the hearing, the IBT also expressed concern about Webster's membership on the board of directors of Anheuser-Busch Companies, Inc. ("Anheuser-Busch"), a major employer of IBT members. Further, the IBT argued that judicial intervention should be delayed to provide Lacey and Burke with an opportunity to break the impasse by conducting further discussions, making additional nominations, and interviewing possible candidates.
 
 
 10
 After hearing argument from both sides, Judge Edelstein ruled that Lacey and Burke had reached an impasse on the selection of the third IRB member. Judge Edelstein stated: " 'You won't reach any agreement. Everything on this record is clear for me to conclude that you will not reach an agreement.... This impasse has been going on. This is not an overnight event.' " IBT, 803 F.Supp. at 813 (quoting transcript of August 4 hearing). In the district court's view "Judge Lacey's and Mr. Burke's and the IBT's views of the necessary experience for membership on the IRB are based on a major philosophical difference concerning the role of the IRB," and were "hopelessly irreconcilable." Id. Judge Edelstein also noted the need to resolve this issue as soon as possible, given the October 10, 1992 date for the commencement of IRB operations. Id. at 813, 818. He then granted the application that Webster serve as the third member of the IRB on the basis that Webster was the best candidate that had been presented to the court. Id. at 816-17.
 
 
 11
 Judge Edelstein found that "[b]ecause the IRB is an investigative and adjudicative body, law enforcement, investigative, and judicial experience qualifies a candidate for service on the IRB." Id. at 815. He noted that the IRB would not be involved in the "day-to-day affairs of the [IBT]," such as "negotiating labor contracts, handling grievances, or lobbying for occupational health and safety regulations." Id. at 814. Judge Edelstein dismissed Burke's concern that Webster's appointment was not appropriate because Webster served on the Anheuser-Busch board of directors, stating that "Judge Webster's position on the board of directors of an employer of Teamsters presents no conflict of interest because the IRB has no role in labor-management relations." Id. at 817.
 
 
 12
 The IBT appeals this decision.
 
 Discussion
 
 13
 On appeal, the IBT contends: (1) that the district court improperly intervened to appoint Webster as the third member of the IRB without giving Lacey and Burke sufficient opportunity to resolve the issue; and (2) that the district court erred in appointing to the IRB an individual who serves on the board of directors of a major employer of IBT members because such an appointment violates section 8(a)(2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 158(a)(2) (1988).[2] We will address each of these issues, but first dispose of the government's threshold challenge to our appellate jurisdiction.
 
 
 14
 A. Appellate Jurisdiction.
 
 
 15
 The government contends in its brief on appeal that this court lacks jurisdiction to review the district court's order appointing Webster to the IRB because it is a nonfinal, noninjunctive order to which the collateral order doctrine of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), does not apply. At oral argument, however, the government appeared to concede that we have appellate jurisdiction at least as to the question whether an impasse was reached that justified Judge Edelstein's intercession to appoint the third member of the IRB. In any event, we hold that this court has jurisdiction over this case pursuant to 28 U.S.C. Sec. 1291 (1988). As we explained in Election Rules:
 
 
 16
 The administration of complex consent decrees such as the present one gives rise to issues of appellate review that differ from those in ordinary litigation. Whereas rulings in ordinary litigation can be reviewed for error and effect on the judgment after that judgment is final, rulings in the course of administering a consent decree concern implementation of the judgment itself, and often require intermediate acts by parties that may be unreviewable if appeals are delayed until compliance is final. A flexible approach is thus necessary....
 
 
 17
 931 F.2d at 183.
 
 
 18
 The government argues that any challenge to Webster's service on the IRB can be dealt with on a case-by-case basis if instances arise in which his service on the board of directors of Anheuser-Busch presents a question of recusal. The IBT argues, however, not only that Webster may have a conflict of interest in a particular case, but also that he is precluded from serving on the IRB by federal labor law. In Election Rules, we stated that "[i]f review of the validity of the orders that govern the elections must await completion of those elections, there may be no effective remedy for an erroneous construction of the Consent Decree." 931 F.2d at 183. The same may be said here. If the IBT is correct on the merits of its argument that Webster is disqualified by the NLRA from service on the IRB, it would not be an effective or adequate remedy for that violation to consign the IBT to ad hoc challenges for bias of individual IRB rulings.
 
 
 19
 We accordingly conclude that we have jurisdiction to hear this appeal.
 
 
 20
 B. The District Court's Finding of Impasse.
 
 
 21
 The IBT and amicus curiae Association for Union Democracy contend that the district court "erred in appointing Judge Webster prior to affording the appointees[ ] of the parties the opportunity to reach a genuine impasse on the issue." The IBT does not challenge the authority of the district court to appoint the third member of the IRB if the appointees of the government and the IBT reach a genuine impasse in their efforts to select that member. Rather, the IBT contends that the district court erred in determining that there was such an impasse on August 4, 1992.
 
 
 22
 We have stated that "[a] genuine impasse in negotiations exists when there is ' "no realistic prospect that continuation of discussion ... would [be] fruitful." ' " NLRB v. WPIX, Inc., 906 F.2d 898, 901 (2d Cir.) (quoting NLRB v. Independent Ass'n of Steel Fabricators, 582 F.2d 135, 147 (2d Cir.1978) (quoting American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 628 (D.C.Cir.1968)), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979)) (alteration in WPIX ), cert. denied, 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 253 (1990). Whether an impasse had been reached is a question of fact, and we must uphold the determination of the district court on this matter unless we find it to be clearly erroneous. See Fed.R.Civ.P. 52(a) ("[f]indings of fact ... shall not be set aside unless clearly erroneous"); see also Ottaviani v. SUNY, 875 F.2d 365, 375 (2d Cir.1989) ("under the clearly erroneous standard, we may only reject findings by the trial court when we are left with the 'definite and firm conviction that a mistake has been committed' ") (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), cert. denied, 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990). In the present case, although we would not necessarily have reached the same conclusion that Judge Edelstein did, we are not firmly convinced that a mistake has been made.
 
 
 23
 Judge Edelstein based his finding of an impasse upon "Judge Lacey's statements at the July 30, 1992 hearing, Judge Lacey's July 31, 1992 letter to Mr. Burke, Mr. Burke's August 3, 1992 letter to Judge Lacey, and the statements of Judge Lacey, Mr. Burke, and Mr. Seltzer [counsel for IBT] at the August 4, 1992 hearing." IBT, 803 F.Supp. at 813. Judge Edelstein concluded:
 
 
 24
 Judge Lacey's and Mr. Burke's and the IBT's views of the necessary experience for membership on the IRB are based on a major philosophical difference concerning the role of the IRB. While Mr. Burke's and Mr. Seltzer's suggestion that Judge Lacey and Mr. Burke take more time to resolve their impasse is not surprising given the new IBT administration's attempt to delay IRB operation and restrict the IRB's authority in disciplinary matters, see August 19, 1992 Opinion & Order, 803 F.Supp. 761, 777, 783-800 (S.D.N.Y.1992) [, modified, 998 F.2d 1101 (2d Cir.1993) ], it ignores that these opposing views were, and are, hopelessly irreconcilable.
 
 
 25
 803 F.Supp. at 813. Having made this determination, Judge Edelstein then ruled that the impasse must be resolved immediately because "[w]ithout the appointment of a third member, the IRB will be unable to operate and the agreement between the parties will be frustrated ... [and] the express purposes of the Consent Decree will be placed in jeopardy." Id.
 
 
 26
 We first note that on the record before us, we are not as certain as Judge Edelstein that the views of Lacey and Burke were "hopelessly irreconcilable." While it is true that Burke was seeking a designee with experience in labor law and union affairs, he had also suggested as nominees three former Assistant Attorneys General. Thus, it does not appear that he viewed labor experience as indispensable. Further, we question Judge Edelstein's assessment that Burke's nominees did not "have the breadth and depth of investigatory and judicial experience necessary to perform tasks that are essential to the IRB's mandate under the Consent Decree," 803 F.Supp. at 816, or that judicial experience is essential to the role of an IRB member.
 
 
 27
 We also recognize that while the IBT's reform administration, like the government, has an interest in the operation of the IRB to further the eradication of corruption within the union, it also has a legitimate interest in limiting intrusion into internal union affairs. We are concerned that Judge Edelstein's resolution of the asserted impasse may have short-circuited the process provided by the Consent Decree. We might not have been so quick to reject Burke's suggestion that he and Lacey interview the nominees and continue discussions within a limited time frame, particularly given the indefinite time period for which the IRB will operate.
 
 
 28
 Despite these reservations, we review Judge Edelstein's finding of impasse only for clear error. We recognize that he, unlike this panel, had the opportunity to see and speak with the parties, and he also faced the approach of the deadline for the operation of the IRB. Given his greater familiarity with the parties and the factual context, we do not find clear error in Judge Edelstein's conclusion that the parties had reached an impasse.
 
 
 29
 B. Webster's Position on the Board of Directors of an Employer of IBT Members.
 
 
 30
 The IBT contends that the appointment of Webster, who serves on the board of directors of Anheuser-Busch, a major employer of IBT members, violates Sec. 158(a)(2). This section provides that it is an unfair labor practice for an employer to dominate or interfere with the administration of a union. See supra note 2. The government contends that this issue should not be addressed because the IBT did not raise it before the district court. However, as the Supreme Court made clear in Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), although courts of appeal should not ordinarily decide issues not presented below, this is not an unvarying rule. The Court stated:
 
 
 31
 The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see Turner v. City of Memphis, 369 U.S. 350 [, 82 S.Ct. 805, 7 L.Ed.2d 762] (1962), or where "injustice might otherwise result." Hormel v. Helvering, 312 U.S. [552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037] [(1941) ].
 
 
 32
 428 U.S. at 121, 96 S.Ct. at 2877 (footnote omitted).
 
 
 33
 Lacey proposed Webster's appointment in a letter to Burke dated July 31, 1992. The hearing at which Judge Edelstein made his decision to appoint Webster was held on August 4, 1992, four days after Webster's name had first been proposed. Burke therefore had an extremely limited time in which to consider this appointment, and any legal issues that it might pose.
 
 
 34
 Further, the IBT did raise before the district court the general issue whether Webster's service as a director of a major employer of IBT members should inhibit his appointment to the IRB, and we have ruled that raising a broad legal issue in the district court sometimes suffices to preserve a more precise or slightly different argument for appeal. See, e.g., Higgins v. New York Stock Exch., 942 F.2d 829, 832 (2d Cir.1991); Bornholdt v. Brady, 869 F.2d 57, 68 (2d Cir.1989). Accordingly, given the time constraints under which the parties were operating and the fact that the IBT raised the question of Webster's directorship in the hearing before the district court, we exercise our discretion to address the Sec. 158(a)(2) issue.
 
 
 35
 On the merits, the issue whether the NLRA precludes membership by a director of an employer of union members on an oversight panel for that union (such as the IRB) appears to be one of first impression. There can be little doubt that Webster is an "employer" for purposes of Sec. 158(a)(2), in view of the statutory definition of "employer" to include "any person acting as an agent of an employer, directly or indirectly." See Sec. 152(2), supra note 2. A director of a corporation unquestionably acts as an agent of that corporation. See United States v. Wallach, 935 F.2d 445, 462 (2d Cir.1991) ("a corporation can only act through its agents--officers and directors") (citing Diamond v. Oreamuno, 29 A.D.2d 285, 287, 287 N.Y.S.2d 300, 302 (1st Dep't 1968), aff'd, 24 N.Y.2d 494, 248 N.E.2d 910, 301 N.Y.S.2d 78 (1969)); cf. NLRB v. New Madrid Mfg. Co., 215 F.2d 908, 913 (8th Cir.1954) (anyone who possesses such right or power of control over conduct of enterprise as to have responsibility for its labor affairs may be treated as Sec. 152(2) employer).
 
 
 36
 We do not believe, however, that serving on the IRB constitutes "dominat[ion] or interfere[nce]" with the "administration" of the IBT within the meaning of Sec. 158(a)(2). Employer domination or interference in the context of Sec. 158(a)(2) pertains to undue employer influence upon labor organizations in connection with the collective bargaining process. See Electromation, Inc., 309 N.L.R.B. 990, 996 (1992) ("when the impetus behind the formation of an organization of employees emanates from an employer and the organization has no effective existence independent of the employer's active involvement, a finding of domination is appropriate if the purpose of the organization is to deal with the employer concerning conditions of employment ") (emphasis added) (collecting cases); Sierra Vista Hosp., Inc. v. California Nurses' Assoc., 241 N.L.R.B. 631, 632-33, 1979 WL 8925 (1979) (noting "inherent statutory concern that '[e]mployees have the right to be represented in collective-bargaining negotiations by individuals who have a single-minded loyalty to their interests' ") (quoting Nassau & Suffolk Contractors' Ass'n, Inc., 118 N.L.R.B. 174, 187 (1957)).
 
 
 37
 We recognized in NLRB v. North Shore University Hospital, 724 F.2d 269 (2d Cir.1983), that Sec. 158(a)(2) "limits the influence of agents of the employer ... upon ... bargaining representatives to ensure that collective bargaining is truly at arms length." Id. at 272. We added that:
 
 
 38
 [A] major purpose of [Sec. 158(a)(2) ] appears to have been the elimination of the celebrated "company-dominated union," Hertzka & Knowles v. NLRB, 503 F.2d 625, 630 (9th Cir.1974) (quoting legislative history of [Sec. 158(a)(2)), cert. denied, 423 U.S. 875 [, 96 S.Ct. 144, 46 L.Ed.2d 106] (1974),] once prevalent as an anti-union device but now only an occasional curiosity, and employer domination of a bargaining representative will justify disestablishment of the organization.
 
 
 39
 Id. (citations partially omitted); cf. Hoyt, Brumm & Link, Inc., 292 N.L.R.B. 1060, 1060-61 (1989) (employer did not violate Sec. 158(a)(2) when one of its supervisors was a delegate to union's national convention and served on union finance committee that was not involved in collective bargaining).
 
 
 40
 In the present case, we perceive no danger that Webster's service on the IRB will compromise or endanger the IBT's collective bargaining efforts. As we stated in United States v. IBT, 954 F.2d 801, 810 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992), "collective bargaining agreements and the Consent Decree address different problems and serve different purposes. The former governs the daily relations between particular employers and their employees, while the latter is an attempt to rebuild the infrastructure of an entire national labor organization." The district court specifically noted in this case that "the IRB has no role in labor-management relations." IBT, 803 F.Supp. at 817. Accordingly, we conclude that Sec. 158(a)(2) does not preclude Webster from serving on the IRB.
 
 
 41
 As to the possibility of a conflict of interest for Webster, or either of the other IRB members, we trust that they can determine in what situations they should recuse themselves in any matter brought before the IRB. As the district court stated: "[I]f any IRB member, at any time, fails to carry out his ... duties responsibly, fairly, and impartially, any of the other IRB members or the parties can make application to this Court to address the matter." IBT, 803 F.Supp. at 817 n. 5.
 
 
 42
 We note that the IBT has brought to our attention Webster's service as a director of Pinkerton Security and Investigations Services ("Pinkerton"), which was not publicly announced until this appeal was pending. There is no claim that Pinkerton employs IBT members, and we do not regard Pinkerton's historic involvement in labor-management controversies as posing any cognizable legal issue with respect to Webster's service on the IBT.
 
 Conclusion
 
 43
 The order of the district court is affirmed. The parties shall bear their own costs.
 
 
 
 *
 The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 We are advised by the IBT that at its 1991 convention, the IBT changed its name to the "International Brotherhood of Teamsters."
 
 
 [2]
 Section 158(a)(2) provides:
 It shall be an unfair labor practice for an employer--
 ....
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay....
 The term "employer" is defined to include "any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. Sec. 152(2) (1988).