UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, the Commission of La Cosa Nostra, Anthony Salerno, a/k/a "Fat Tony," Matthew Ianniello, a/k/a "Matty the Horse," Anthony Provenzano, a/k/a "Tony Pro," Nunzio Provenzano, a/k/a "Nunzi Pro," Anthony Corallo, a/k/a "Tony Ducks," Salvatore Santoro, a/k/a "Tom Mix," Christopher Furnari, Sr., a/k/a "Christie Tick," Frank Manzo, Carmine Persico, a/k/a "Junior," "The Snake," Gennaro Langella, a/k/a "Gerry Lang," Philip Rastelli, a/k/a "Rusty," Nicholas Marangello, a/k/a "Nicky Glasses," Joseph Massino, a/k/a "Joey Messina," Anthony Ficarotta, a/k/a "Figgy," Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, a/k/a "Maishe," John Tronolone, a/k/a "Peanuts," Joseph John Aiuppa, a/k/a "Joey O'Brien," "Joe Doves," "Joey Aiuppa," John Phillip Cerone, a/k/a "Jackie the Lackie," "Jackie Cerone," Joseph Lombardo, a/k/a "Joey the Clown," Angelo Lapietra, a/k/a "The Nutcracker," Frank Balistrieri, a/k/a "Mr. B," Carl Angelo Deluna, a/k/a "Toughy," Carl Civella, a/k/a "Corky," Anthony Thomas Civella, a/k/a "Tony Ripe," General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trerotola, a/k/a "Joe T," First Vice President,

Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President, Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, a/k/a "Sammy Pro," Former Vice President, Defendants.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

Aug. 25, 1992.

See also, 803 F.Supp. 761.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Steven C. Bennett, Christine Chung, Asst. U.S. Attys., of counsel) for U.S.

Cohen, Weiss & Simon, New York City (Richard M. Seltzer, Jami K. Rachelson, of counsel) for Intern. Broth. of Teamsters.

Frederick B. Lacey, Independent Adm. of the Intern. Broth. of Teamsters and Member of the Independent Review Bd., Newark, N.J., for Intern. Broth. of Teamsters.

Harold E. Burke, Sp. Asst. to the General President of the Intern. Broth. of Teamsters and Member of the Independent Review Bd., for Intern. Broth. of Teamsters.

## OPINION & ORDER

EDELSTEIN, District Judge:

This Opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against, *inter alia*, the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). Pursuant to Section K.16 of the Consent Decree, the Independent Administrator and the Government made an application to this Court involving Section G of the Consent Decree, which provides for the establishment of an Independent Review Board (the "IRB," "Review Board," or "Board"). Specifically, after an impasse was reached in selecting the third member of the IRB, the Independent Administrator and the Government sought the appointment of Judge William H. Webster as the third member of the IRB. After a hearing on this issue on August 4, 1992, this Court granted the application and appointed Judge Webster to the IRB. (Transcript of August 4, 1992 Hearing, pp. 35–36). This Opinion supplements that order.

## I. BACKGROUND [1]

### A. The Government's Suit

On June 28, 1988, the Government filed this civil action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, against the IBT, its GEB, the individual members of the GEB, the Commission of La Cosa Nostra, and 26 alleged members of La Cosa Nostra. The Government alleged that the Union suffered from rampant corruption and La Cosa Nostra domination. In order to purge the IBT of these nefarious influences and restore union democracy, the Government sought sweeping relief, including the appointment of court liaison officers vested with certain powers of the IBT General President and the GEB and with authority to supervise general elections for IBT International Union Office.

On the eve of trial, March 14, 1989, the IBT and the Government settled the action and entered into the Consent Decree. In the precatory paragraphs of the Consent Decree, the IBT admits "that there have been allegations, sworn testimony and judicial findings of past problems with La Cosa Nostra corruption of various elements of the IBT." Consent Decree, at p. 2 (fourth Whereas clause). Based on this admission, the IBT agrees "that there should be no criminal element or La Cosa Nosa corruption of any part of the IBT." *Id.* (fifth Whereas clause). Moreover, the IBT agrees "that it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integri-

---

1. This section of the Opinion reproduces, in large part, this Court's August 19, 1992 Opinion & Order, 803 F.Supp. 761, 766–69 (S.D.N.Y. 1992). The opinions, memoranda, and orders filed in this case, *United States v. IBT*, 88 Civ. 4486 (DNE), are cited in this Opinion first by referring to the date of the opinion, memorandum, or order and then to the official citation.

ty and for the sole benefit of its members without unlawful outside influence." *Id.* (sixth Whereas clause). The framework of reform sought by the Government in ·its Complaint was preserved in the Consent Decree in order to achieve these goals.

### B. The Court–Appointed Officers

Pursuant to Section F of the Consent Decree, this Court appointed three officers: an Independent Administrator, an Investigations Officer, and an Election Officer (collectively, the "Court–Appointed Officers"). In May 1989, this Court appointed Frederick B. Lacey to serve as the Independent Administrator, Charles M. Carberry to serve as the Investigations Officer, and Michael H. Holland to serve as the Election Officer.

The Independent Administrator is vested with a broad range of powers under the Consent Decree, including: (1) the disciplinary powers of the General President and the GEB, which he may use to eradicate corruption within the IBT and to appoint temporary trustees for distressed Locals; (2) the power to review all disciplinary and trusteeship decisions of the General President and the GEB; and (3) the authority to veto proposed or actual expenditures, contracts, and appointments if he believes that such conduct furthers an act of racketeering. Consent Decree, §§ F.12(A)–(B) The Investigations Officer has authority to investigate corruption in the IBT and to bring disciplinary charges before the Independent Administrator. *Id.,* § F.12(A). The Consent Decree also provides for the first direct rank-and-file secret ballot election for International Union Officers and authorizes the Election Officer to supervise it. *Id.;* § F.12(D). Any Court–Appointed Officer, as well as any party, may make an application to this Court to resolve an issue involving the Consent Decree. *Id.,* §§ F.12(I), K.16.

In fulfilling his mandate under the Consent Decree, the Investigations Officer has filed charges against 185 individuals and three Local Unions. These charges resulted from investigations that entailed examining books and records, interviewing and taking testimony from union officers and members, reviewing information supplied by IBT members, and taking sworn statements. The Independent Administrator has conducted at least 73 hearings on disciplinary charges brought by the Investigations Officer, rendered numerous decisions, imposed at least 9 trusteeships on IBT Locals, and decided over 250 appeals from decisions of the Election Officer on election protests. The Independent Administrator has also reviewed appointments, expenditures, the handling of funds, and transfer of assets, and has communicated with the membership through the IBT magazine while also supervising the magazine's publication. The Election Officer supervised all aspects and stages of the first IBT secret ballot rank-and-file election, including the election of delegates to the IBT Convention from the over 600 IBT Local Unions, the nominations for International Union Office at the IBT Convention, and the approximately 1.5 million member rank-and-file general election of International Union Officers. The Election Officer certified the results of the election on January 22, 1992, which saw Mr. Ronald C. Carey elected IBT General President.

### C. The Independent Review Board

The certification of the election results marks a point of transition in the Consent Decree. The termination of the Court–Appointed Officers' authority is related to this event, and indeed, their terms of office will soon end. *See* Consent Decree, § B.3(2). Certification of the election results, however, also heralds the birth of the Independent Review Board, which is the subject of this application. The Consent Decree provides that "[f]ollowing the certification of the 1991 election results, there shall be established an Independent Review Board." *Id.,* § G.

The IRB is to consist of three members, one chosen by the Attorney General of the United States on behalf of the Government, one chosen by the IBT, and a third person chosen by the Attorney General's and the IBT's designees. *Id.,* § G. The Attorney General chose Frederick B. Lacey, currently the Independent Administrator, as his

designee on March 8, 1992. The IBT chose Harold E. Burke, Special Assistant to IBT General President Ronald C. Carey, as its designee on April 9, 1992. This Opinion involves this Court's resolution of an impasse reached by Judge Lacey and Mr. Burke in selecting the third member of the IRB. At a hearing on August 4, 1992, this Court confirmed the nomination of William H. Webster to serve as the third member of the IRB. (Transcript of August 4, 1992 Hearing, pp. 35–36).

The Consent Decree addresses various aspects of IRB operation, including general matters of IRB administration, the IRB's disciplinary powers, and the investigatory and disciplinary process. As to general administration, for instance, the Consent Decree touches upon such matters as funding and staffing. Section G(1) states that "the IBT shall pay *all costs and expenses* of the [IRB] and its staff (including all salaries of [IRB] members and staff)." Consent Decree, § G(1) (emphasis added). In addition, the IRB may hire a staff of investigators and attorneys to assist in the performance of its duties. *Id,* § G(a).

The Consent Decree also sets forth the IRB's investigatory and disciplinary powers, and a process for acting on the results of its investigations. The IRB is vested with the same investigatory authority as enjoyed by the General President and the General Secretary–Treasurer under the IBT Constitution and applicable law. *Id.,* § G(b). The IRB must use this authority to investigate, *inter alia,* (1) "any allegations of corruption," (2) "any allegations of domination or control or influence of any [part of the] IBT ... by La Cosa Nostra or any other organized crime group, and (3) "any failure to cooperate fully with the Independent Review Board." *Id.,* § G(a).

Upon completing an investigation, the IRB must issue a written report (the "Investigative Report") setting out its charges, findings, and recommendations concerning a disciplinary or trusteeship matter. *Id.,* § G(d). The Investigative Report is then referred to an appropriate IBT entity, which must "promptly take whatever action is appropriate under the circumstances." *Id.,* § G(e). "Within 90 days of the referral, the IBT entity must make

written findings setting forth the specific action taken and the reasons for such action." *Id.*

The IRB's role in a particular matter does not end upon this referral to an IBT entity. Instead, the IRB must monitor its referrals. If the IRB determines that the IBT entity has not pursued a referred matter in "a lawful, responsible, or timely manner," or that the IBT entity's proposed resolution "is inadequate under the circumstances," the IRB must notify the relevant IBT entity of its determination and the reasons for it. *Id.,* § G(f). Within 10 days of the IRB's notice, the relevant IBT entity must "set forth in writing any and all additional actions it has taken and/or will take to correct the defects set forth in [the] notice and a deadline by which said action may be completed." *Id.,* § G(g). The IRB shall "immediately thereafter" issue a written determination "concerning the adequacy of the additional action taken and proposed by the IBT entity." *Id.* If the IRB finds that the IBT entity has not remedied the defects specified in the IRB's notice, the IRB promptly shall convene a hearing. *Id.*

The IRB assumes an adjudicatory role at this hearing, which is meant to determine an appropriate course of action in a particular matter. After conducting a "fair hearing" pursuant to the rules and procedures generally applicable to a labor arbitration hearing, the IRB must issue a written decision, which "shall be final and binding." *Id.,* §§ G(h), (i). The GEB must then take whatever action is necessary to implement the decision, "consistent with the IBT Constitution and applicable Federal laws." *Id.,* § G(i). The IRB, however, is empowered to examine and review the GEB's implementation of the IRB's decisions; if the IRB is dissatisfied with the GEB's efforts, the IRB has "the authority to take whatever steps are appropriate to insure proper implementation" of its decision. *Id.,* § G(j).

In addition to initiating an investigation, which results in the filing of an Investigative Report and the process just described, the IRB also may review the GEB's own disciplinary and trusteeship decisions. *Id.,* § G(k). After such review, the IRB may make a determination, which is final and

binding, that affirms, modifies, or reverses any such GEB decision. *Id.*

In sum, Section G of the Consent Decree empowers the IRB to eradicate corruption in the IBT on its own initiative and to monitor IBT efforts to purge corruption in the Union. In this way, the IRB may be considered a successor to the Investigations Officer and the Independent Administrator. Its activities, however, are limited to the disciplinary sphere of union activity; it has no involvement in the day-to-day operations of the Union.

## II. DISCUSSION

At a hearing before this Court on July 30, 1992, this Court learned that Judge Lacey, the Attorney General's designee to the IRB, and Mr. Burke, the IBT's designee to the IRB, had reached an impasse in selecting the third member of the IRB as required by the Consent Decree. This Court directed both Judge Lacey and Mr. Burke to appear before the Court on August 4, 1992 to resolve the matter. In the interim, Judge Lacey attempted to resolve the impasse by nominating Judge William H. Webster for the third seat on the IRB. This attempted resolution failed when Mr. Burke and the IBT rejected Judge Webster's nomination. The impasse stemmed from conflicting views of the role of the IRB and the qualifications necessary for IRB service. At the August 4, 1992 hearing, this Court found that the Consent Decree reveals that the IRB's mandate to eradicate corruption from the IRB includes investigative and adjudicative tasks and requires a background in these areas. This Court then resolved the impasse by selecting the most qualified candidate for IRB membership nominated by Judge Lacey and by Mr. Burke and the IBT: Judge Webster.

*A. The Attorney General's Designee and the IBT's Designee Reached an Impasse over Appointment of the Third Member of the IRB That Required Resolution By This Court*

### 1. The Impasse

#### a. The July 30, 1992 Hearing

At a hearing before this Court on July 30, 1992 that addressed the promulgation of rules for IRB operation, at which both Judge Lacey and Mr. Burke were present, Judge Lacey informed the Court of his and Mr. Burke's attempts to agree on the third member of the IRB. (Transcript of July 30, 1992 Hearing, pp. 89–90). Judge Lacey stated that he had presented Mr. Burke with the names of several individuals he thought suitable for the position. Mr. Burke rejected these names. Mr. Burke then suggested three individuals for the position. Judge Lacey rejected them because he did not believe they had the necessary experience for the position. Subsequently, Judge Lacey rejected three additional suggestions made by Mr. Burke. Having reached an impasse, Judge Lacey indicated that he would try to find someone of "unchallengeable, national reputation, background and experience." *Id.* at 90. Judge Lacey then stated that if Mr. Burke rejected this suggestion, he would have to bring an application before this Court. *See id.* at 91. In response, this Court directed Judge Lacey and Mr. Burke to attend a hearing the following Tuesday, August 4, 1992, to resolve the matter: "I don't know what your schedule is or Mr. Burke's, but unless you change my mind, I will expect you here on Tuesday, [August 4, 1992,] no later than 11:00 o'clock, to resolve this matter. I hate vacuums." *Id.*

#### b. Judge Lacey's Nomination of Judge Webster: Judge Lacey's and Mr. Burke's Correspondence

In a letter dated July 31, 1992, Judge Lacey attempted to resolve the impasse by proposing to Mr. Burke that Judge William H. Webster serve as the third member of the IRB. In the letter, Judge Lacey referred to Judge Webster's background and to the stature his appointment would give the IRB:

As you will see, [Judge Webster] has served as United States Attorney, a United States District Judge, a Judge on the United States Court of Appeals, has been the Director of the Federal Bureau of Investigation and thereafter Director of

the Central Intelligence Agency. He is now practicing law in Washington. In addition to everything else, he is readily available for meetings in office space that we will occupy in Washington.

His designation would give tremendous stature to the Independent Review Board and I hope that you—and anyone with whom you see fit to confer—will find him acceptable.

Letter from Judge Lacey, Member of the IRB, to Harold E. Burke, Member of the IRB (July 31, 1992) (on file with the Southern District of New York). Judge Webster's curriculum vitae was attached to Judge Lacey's letter.

In another letter dated July 31, 1992, Judge Lacey informed the Attorney General of the United States, William P. Barr— who appointed Judge Lacey to the IRB— about the nomination of Judge Webster:

Mr. Burke and I have been at an impasse in trying to appoint the third member, as required by the Consent Decree. This is to advise you that, in an effort to resolve this impasse, I am now proposing to Mr. Burke that Judge William H. Webster be the third person on the Board.

Letter from Frederick B. Lacey, Member of the IRB, to William P. Barr, Attorney General of the United States (July 31, 1992) (on file with the Southern District of New York). Similarly, in a letter dated July 31, 1992, Judge Lacey informed William A. Sessions, Director of the Federal Bureau of Investigation, of his intention to propose to Mr. Burke that Judge Webster be the third member of the IRB. Judge Lacey noted that he and "Mr. Burke ... have been at an impasse in trying to appoint the third member, as required by the Consent Decree." Letter from Frederick B. Lacey, Member of the IRB, to William A. Sessions, Director, Federal Bureau of Investigation (July 31, 1992) (on file with the Southern District of New York).

Judge Lacey's proposal, however, did not resolve the impasse. In a letter dated August 3, 1992, over the signature of Mr. Burke, the proposed appointment of Judge Webster was rejected. The letter stated that Mr. Burke, IBT General President Car-

ey, and "others in the Teamsters Union," felt that Judge Webster was not the best-suited person for the third seat on the IRB:

I have given a great deal of thought to your suggestion of William Webster to serve as the neutral party on the Independent Review Board. I have also reviewed your suggestion with General President Carey and others in the Teamsters Union. Although Mr. Webster is clearly an impressive individual in the fields of law and investigation, it is our unanimous judgement that he is not the person best-suited to the role of third party on the IRB.

We continue to believe that the neutral party on the IRB should be a person with knowledge of, and experience, with, the work of labor unions, in addition to having a background in investigation and law enforcement. That is why we have offered the names of former Secretaries of Labor Ray Marshall and William Usery.

Letter from Harold E. Burke, Member of the IRB, to Frederick B. Lacey, Member of the IRB (August 3, 1992) (on file with the Southern District of New York).

### c. The August 4, 1992 Hearing

At the August 4, 1992 hearing, this Court addressed Judge Lacey's and Mr. Burke's inability to agree on a third member of the IRB. As Judge Lacey's and Mr. Burke's letters indicate, the inability to agree on a third member of the IRB stems from differing views on the nature of the IRB and disagreement as to who is best equipped to serve on that body. While Mr. Burke and the IBT believe that the position requires someone with strong experience in labor relations and union affairs, Judge Lacey believes that service on the IRB requires someone with strong law enforcement, prosecutorial, and judicial experience. Statements at the August 4, 1992 hearing amplified their philosophical dispute.

In explaining Mr. Burke's position, counsel for the IBT, Mr. Richard Seltzer, stated that:

I think that the nominations themselves reflect what Mr. Burke attempted—the nominations that Mr. Burke made to Judge Lacey weren't nominations of people who had both an understanding of labor relations and labor unions and who had responsibility for investigations of exactly the type that the IRB were going to be asked to investigate.... With all due respect, I do not believe that Judge Lacey—or he has not provided us, I am not aware of information concerning any particular expertise or background in labor relations [of] his nominees.

(Transcript of August 4, 1992 Hearing, pp. 22–23). Among the individuals suggested by Mr. Burke and the IBT for the third position on the IRB, were Ray Marshall, former member of the Federal Reserve Board, Secretary of Labor under President Carter and now a Professor at the University of Texas, and William Usery, Secretary of Labor under President Ford. Mr. Burke and the IBT also suggested John Doar, a former Assistant Attorney General in the Civil Rights Division of the Justice Department and now a practicing attorney, Marshall Burke, a former Assistant Attorney General in the Department of Justice, and Stephen Pollack, a former Assistant to the Solicitor General, former Assistant Attorney General in the Civil Rights Division of the Justice Department and now a practicing attorney in Washington, D.C. *Id.* at 21. In addition, Mr. Seltzer averred that Judge Lacey and Mr. Burke were not truly at an impasse. *Id.* at 26. Mr. Seltzer advocated the suggestion, contained in Mr. Burke's August 3, 1992 letter to Judge Lacey, that Mr. Burke and Judge Lacey have further discussions on the disputed appointment, make additional nominations, and interview possible candidates. *Id.* at 24–25.

In response, Judge Lacey stated that interviews were not necessary because the dispute involved conflicting notions of the qualifications necessary for successful service on the IRB, not differences over personalities. Because the dispute involved such a fundamental philosophical difference, Judge Lacey stated his belief that he and Mr. Burke had reached an impasse that required resolution by this Court. He noted that "Mr. Burke and I came at this from different directions. This is exemplified by his first giving me the names of the like of Mr. Marshall and Mr. Usery. I rejected them not because I felt that these were not good men but because that's not what I perceive is needed in this position." *Id.* at 9. Judge Lacey added that:

Mr. Usery and Mr. Marshall I have no quarrel with, as fine men. But they are not what we need here. I will put this in rhetorical terms. Would your honor have thought for one minute of putting Mr. Usery or Mr. Marshall in the position of independent administrator if you had the knowledge you have about them? I suggest, and do this respectfully, your own experience with the Department of Labor's inability to cleanse a union would have led you to steer in a different direction.

Now, in an effort to delay these proceedings further, you are asked to suggest to me that I sit down with Mr. Burke. We have met. We have had telephone conversations. We are just philosophically opposed.... Now it is suggested that we attenuate this process by having me sit down with the people he's named. I don't have to sit down with John Doar or Marshall Burke. This is not a personality thing. These are fine fellows I'm sure to have a drink with but that's not what we are talking about. They cannot escape their background because it is a good background. That's what I am relying on. Not whether I like them or don't like them. Not whether I like or don't like Usery or Ray Marshall.

This is not a personality thing. As long as he was giving me names like this I had to reject them. And that's why I finally had to say to your Honor that where Mr. Burke and the IBT [were] coming from was not where I was coming from, and we were never going to be able to agree, and that's why I was going to have to put an application before you this week.

*Id.* at 29–32. Consistent with his philosophy, Judge Lacey offered the names of,

among others, an individual who was a United States Attorney and a Federal District Judge, and another individual who was a former Assistant United States Attorney in this District.[2]

This Court found at the August 4, 1992 hearing that Judge Lacey and Mr. Burke had reached an impasse in selecting the third member of the IRB. *Id.* at pp. 26–27 ("You won't reach any agreement. Everything on this record is clear for me to conclude that you will not reach an agreement.... This impasse has been going on. This is not an overnight event."). This finding was based on Judge Lacey's statements at the July 30, 1992 hearing, Judge Lacey's July 31, 1992 letter to Mr. Burke, Mr. Burke's August 3, 1992 letter to Judge Lacey, and the statements of Judge Lacey, Mr. Burke, and Mr. Seltzer at the August 4, 1992 hearing. Judge Lacey's and Mr. Burke's and the IBT's views of the necessary experience for membership on the IRB are based on a major philosophical difference concerning the role of the IRB. While Mr. Burke's and Mr. Seltzer's suggestion that Judge Lacey and Mr. Burke take more time to resolve their impasse is not surprising given the new IBT administration's attempt to delay IRB operation and restrict the IRB's authority in disciplinary matters, *see* August 19, 1992 Opinion & Order, 803 F.Supp. 761, 777, 783–800 (S.D.N.Y.1992), it ignores that these opposing views were, and are, hopelessly irreconcilable.

### 2. The Impasse Necessitated an Application to this Court

Having reached an impasse, application to this Court was proper. Section K.16 of the Consent Decree provides that "[t]his Court shall retain jurisdiction to supervise the activities of the [Independent] Administrator and to entertain any future applica-

tions by the [Independent] Administrator or the parties." The power of the Independent Administrator and the parties to bring an application before this Court is well settled. Section K.16 of the Consent Decree permits an application based upon any issue—including a prospective matter—that touches upon a provision of the Consent Decree. Indeed, this Court has held that "[t]he scope of [Section] K.16 is broad enough to warrant the court to consider prospective matters that may threaten the letter, spirit and intent of this Decree." May 6, 1991 Opinion & Order, 764 F.Supp. 787, 791 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991).[3]

The Independent Administrator and the Government have brought this application requesting that this Court address an issue that both poses a grave threat to implementation of the Consent Decree and requires an interpretation of that agreement. The Consent Decree requires the IRB to begin operation no later than October 10, 1992. *See* August 19, 1992 Opinion & Order, 803 F.Supp. at 780, 781 n. 10 (S.D.N.Y.1992). Without the appointment of a third member, the IRB will be unable to operate and the agreement between the parties will be frustrated. Moreover, because IRB operation promotes the eradication of corruption from the IBT and fosters union democracy, the express purposes of the Consent Decree will be placed in jeopardy. Resolution of this application requires this Court to assess the qualifications of various candidates for IRB membership in light of the IRB's role as agreed to by the parties. Given the threat to the implementation of the Consent Decree posed by the impasse and the interpretation of that agreement required to resolve the impasse, this application is appropriate under Section K.16 of the Consent Decree.

---

**2.** Judge Lacey stated that "I prefer to avoid naming the names I gave [Mr. Burke] because I don't want those people to be embarrassed on the record." (Transcript of August 4, 1992 at pp. 9–10).

**3.** In addition, the Rules and Procedures for the Operation of the Independent Review Board for the International Brotherhood of Teamsters pro-

vide that "[i]n the event of a deadlock, in a situation where two IRB members have voted, the third IRB member shall be consulted and shall cast the deciding vote. In the event of a deadlock, where the third member fails or refuses to vote on the matter, the matter shall be referred to this Court for final disposition." August 19, 1992 Opinion & Order, 803 F.Supp. 761 at Exhibit A, Rule D(2) (S.D.N.Y.1992).

### B. The Nature of the IRB's Assignment Dictates Who Is Qualified to Serve on the IRB

#### 1. IRB's Role in the IBT Under the Consent Decree

A review of the Consent Decree reveals that while the IRB occupies a central role in the Consent Decree's anti-corruption scheme, it has no role in day-to-day affairs of the Union. The Consent Decree provides that the IRB shall be authorized to investigate:

(1) any allegations of corruption, including bribery, embezzlement, extortion, loan sharking, violation of 29 U.S.C. § 530 of the Landrum Griffin Act, Taft Hartley Criminal violations or Hobbs Act violations, or (2) any allegations of domination or control or influence of any IBT affiliate, member or representative by La Cosa Nostra or any other organized crime entity or group, or (3) any failure to cooperate fully with the Independent Review Board in any investigation of the foregoing.

Consent Decree, § G(a). To conduct investigations of such allegations, the Consent Decree vests the IRB with the investigative authority of the General President and the General Secretary–Treasurer, id, § G(b), including the power to conduct sworn in-person examinations, examine books and records, and attend meetings of any IBT affiliated entity. See August 19, 1992 Opinion & Order, 803 F.Supp. 761 at Exhibit A, Rule H(2) (S.D.N.Y.1992).

Based on the results of its findings, the IRB must issue Investigative Reports to the appropriate IBT entity for action and monitor the IBT entity's handling of the matter to ensure that it acts in a lawful, responsible, and timely manner. Consent Decree, §§ G(d)–(e). If the IRB determines, in its sole judgment, that a matter is not being pursued in a lawful, responsible, and timely manner, the IRB must notify the IBT of its decision. Id., § G(f). Within 10 days of such notice, the IBT must file an affidavit with the IRB explaining what it has done to address the IRB's concerns. Id., § G(g). If the IRB is still not satisfied with the IBT's handling of the matter, the IRB must promptly convene a hearing. Id. After conducting a fair and impartial hearing, the IRB must issue a written decision, which is final and binding. Id., §§ G(g)–(h).

The IRB must also review IBT disciplinary and trusteeship decisions. Id., § G(k). After such review, the IRB may affirm, modify, or reverse the IBT's decision. Id. The IRB's decision is final and binding. Id. In addition, the IRB has the authority to monitor all of its decisions and take whatever action is necessary to enforce them. Id, § G(j).

The Consent Decree thus vests the IRB with investigative and adjudicative authority to eradicate corruption from the IBT. The Consent Decree does not give the IRB authority to run the IBT. The IRB will have no involvement in the day-to-day affairs of the Union. For example, the IRB will not be involved in such matters as negotiating labor contracts, handling grievances, or lobbying for occupational health and safety regulations. As this Court stated at the August 4, 1992 hearing:

The independent review board is not designed to run day-to-day operations of the IBT. Those areas are left to the IBT. The independent review board has a more focused purpose. The purpose is to eradicate corruption from the IBT. To accomplish this task the consent decree vests the board with investigative as well as adjudicatory power. As adjudicators board members must sit not only as triers of fact but must also act in a manner of speaking like a Court of Appeals when they are called upon to review the disciplinary and trusteeship decisions of the IBT.

(Transcript of the August 4, 1992 Hearing, p. 7).

Armed with investigative and adjudicative authority, the IRB is entrusted with the mission of eradicating corruption "in both a cooperative environment created by an IBT administration truly dedicated to reform and a hostile environment created by an IBT administration dedicated to thwarting reform." August 19, 1992 Opinion & Order, 803 F.Supp. 761, 780 (S.D.N.Y.

1992). The IRB will serve as a perpetual agent of reform "—independent of the parties, vigilant in the fight against corruption, and stalwart in the promotion of union democracy." *Id.* The presence of the IRB in the disciplinary process assures that "the hard-working rank-and-file of this Union always will have an ally dedicated solely to serving their interests in a union free from mafia influence and corruption." *Id.* at 780.

Given the IRB's mission, it is apparent that a person who accepts an appointment on the IRB assumes an awesome responsibility. To discharge this responsibility effectively and efficiently, IRB members must have a background that complements the nature of the IRB's role and the tasks it must perform. Because the IRB is an investigative and adjudicative body, law enforcement, investigative, and judicial experience qualifies a candidate for service on the IRB.

### 2. All IRB Members Must Be Independent

Service on the IRB also requires stalwart and unwavering independence. This notion seems lost on Mr. Burke and the IBT. For example, Mr. Burke's August 3, 1992 letter to Judge Lacey refers to the selection of the third member of the IRB as the selection of "the neutral party." Letter from Harold E. Burke, Member of the IRB, to Frederick B. Lacey, Member of the IRB (August 3, 1992) (on file with the Southern District of New York). Mr. Burke's use of the phrase "the neutral party" suggests that he will always advocate the IBT's interests and Judge Lacey will always advocate the Government's interests, requiring a third "neutral" person to break the tie. (Transcript of August 4, 1992 Hearing, pp. 5–6). This suggestion ignores that the IBT and the Government do not have separate and distinct interests in IRB operation; both parties' interests are served by the eradication of corruption from the Union.

To serve both parties' interests, each IRB member must exercise his or her authority independently, fairly, courageously, and without bias, fear, or sympathy. As this Court stated:

The Independent Review Board is broadly empowered to eliminate corrupt elements of the IBT. Such a task requires detachment, for the very presence in the Consent Decree of an IRB—like the Court–Appointed Officers before it—testifies to the difficulties of internal policing. Therefore, to accomplish its tasks, each IRB member must be fair and independent.

August 19, 1992 Opinion & Order, 803 F.Supp. 761, 796 (S.D.N.Y.1992); *see also id.* at Exhibit A, Rule F(3) ("No member of the IRB or its staff, including the Chief Investigator, shall, at the same time as he holds any position with the IRB, hold any position with the Government, the IBT, or any IBT affiliate, other than membership in the IBT."). If any member of the IRB fails to exercise his or her authority in this fashion, several unacceptable outcomes may result: (1) IBT members or entities may be unfairly disciplined, (2) IBT members or entities may wrongly escape discipline, and (3) the rank-and-file may lose confidence in the IRB's ability to eradicate corruption from the Union. To dissuade Mr. Burke, or anyone else, from the notion that an IRB member may act in a partisan manner, this Court stated that it would not tolerate any bias or favoritism:

My expectation, and it is resolute, and believe me, gentlemen, I will stand for no nonsense whatsoever, I will use the full force of my judicial power and position if I find there is any, any, any bias or favoritism by any member of this board. I expect each member to discharge his duties responsibly, fairly, independently, courageously and without favor or bias.

The independent review board is meant to have three, three neutral members—not two partisans and one neutral member.

(Transcript of August 4, 1992 Hearing, p. 6).

Both Mr. Burke and Mr. Seltzer averred that the word "neutral" was not meant to imply any partisanship by the IBT's designee or the Attorney General's designee. Mr. Burke first explained his use of the word "neutral" as a term of art under the

Taft–Hartley Act. *Id.* at 13. Mr. Seltzer next explained Mr. Burke's use of the word "neutral" as "common terminology used throughout labor relations where one member is selected by one party and one member is selected by another party and those two select a third member." *Id.* 19–20.

Even if Mr. Burke used the word "neutral" as a term of art, its use reflects the partisan mind-set both Mr. Burke and the IBT have brought to the formation of the IRB. Mr. Burke's letter states that Mr. Burke reviewed the nomination of Judge Webster with "General President Carey and others in the Teamsters Union." Letter from Harold E. Burke, Member of the IRB, to Frederick B. Lacey, Member of the IRB (August 3, 1992) (on file with the Southern District of New York). Although the letter is written over Mr. Burke's signature, the letter often uses the plural pronoun "we." For example, the letter states: "*We* continue to believe that the neutral party on the IRB should be a person with knowledge of, and experience with, the work of labor unions, in addition to having a background in investigations and law enforcement. That is why *we* have offered the names of former Secretaries of Labor Ray Marshall and William Usery." *Id.* (emphasis added). By consulting with IBT General President Carey and other Teamsters in the process of selecting a third member of the IRB, Mr. Burke has compromised his independence in making his very first decision as a member of that Board. Moreover, the IBT's involvement in the exercise of Mr. Burke's authority as a member of the IRB constitutes an improper incursion into IRB affairs. It is chilling that a Union which entered into the Consent Decree to eradicate improper outside influences, would itself improperly influence an independent body designed to achieve this goal.

While Mr. Burke has embarked upon his service in the IRB by consulting with IBT General President Carey and other Teamsters, Judge Lacey made his nomination of Judge Webster without any input or assistance from, or discussions with, the Government. Indeed, the Government did not learn of Judge Lacey's nomination of Judge Webster until August 3, 1992—three days after the nomination was made. (Transcript of August 4, 1992 Hearing, p. 11). This type of independence is required of IRB members in the exercise of all facets of their duties.

### C. The IBT's Nominees for the Third Seat on the IRB

Mr. Burke's and the IBT's primary candidates for appointment to the third seat on the IRB were two former Secretaries of Labor: William Usery and Ray Marshall. These two men undoubtedly have extensive experience in union affairs. *See, e.g.,* William H. Miller, *A Window of Peace?,* Industry Week, October 19, 1987, at 22 ("Probably no one knows more about collective bargaining than W.J. Usery."); Peter Gall, *Ray Marshall: Caught in the Middle,* Business Week, January 22, 1979, at 106 ("Marshall has been especially effective in demanding that the government keep a strong presence in regulating health and safety in the workplace."). In addition, their positions as Secretaries of Labor entailed an investigative aspect. *See* Labor Management Relations Disclosure Act, 29 U.S.C. § 501 *et seq.*

They do not, however, have the breadth and depth of investigatory and judicial experience necessary to perform tasks that are essential to the IRB's mandate under the Consent Decree. The other candidates proposed by Mr. Burke and the IBT, *see* (Transcript of August 4, 1992 Hearing, p. 21), are similarly lacking. This is no slight to those candidates, who have fine records of which they should be proud.

### D. Judge William H. Webster Is Uniquely Qualified to Serve on the IRB

At the August 4, 1992 hearing this Court stated that to resolve the impasse it would chose the best candidate for the job nominated by either Judge Lacey or Mr. Burke: "I am going to make my decision on the record, and I'm choosing the best that's before me. If [Mr. Burke or the IBT] can come up with a better name than Webster,

I'll yield to it." (Transcript of August 4, 1992 Hearing at p. 18). Of the names presented to this Court, Judge Webster is uniquely qualified to serve on the IRB.[4]

Judge Webster's background in the investigative process is unparalleled. Judge Webster served as Director of Central Intelligence from May 1987 until September 1991. Immediately before assuming this directorship, Judge Webster was Director of the Federal Bureau of Investigation, a position he assumed in February 1978. In addition, Judge Webster served as United States Attorney for the Eastern District of Missouri from 1960 until 1961. Judge Webster's judicial experience is equally impressive. From 1973 until 1978, he served as a Judge on the United States Court of Appeals for the Eighth Circuit. Before his elevation to this position, he was a District Judge for the United States District Court for the Eastern District of Missouri. In each of these positions, Judge Webster has enjoyed an exemplary reputation for "fairness, integrity and impartiality." *Id.*

Moreover, Judge Webster's character is unassailable. Four Presidents, of both political parties, appointed Judge Webster to five different high-level positions in the United States Government. President Eisenhower named Judge Webster United States Attorney for the Eastern District of Missouri. President Nixon nominated Judge Webster to be a United States District Judge in the Eastern District of Missouri and also nominated him for a seat on the Eighth Circuit Court of Appeals. President Carter sent Judge Webster's name to the Senate as his nominee for Director of the Federal Bureau of Investigation. Finally, President Reagan nominated Judge Webster as Director of Central Intelligence. The Senate confirmed Judge Webster's nominations on all five occasions.

In addition, Judge Webster has been acknowledged for excellence in a variety of areas, including law enforcement, legal scholarship, and public service. Judge Webster received the Presidential Medal of Freedom and the National Security Medal. He is also the recipient of Honorary Degrees from seventeen separate colleges, universities, and law schools.

In light of Judge Webster's background and the tasks the IRB will perform, it is easy to understand Judge Lacey's comment at the August 4, 1992 hearing that "I think, your Honor, I came up with a name that no one could question.... I think the IBT would be fortunate to have somebody like him and I was pleased that I was able to persuade him to let me propose his name." *Id.* at 11. Judge Webster's background certainly supports Judge Lacey's decision to propose Judge Webster. Judge Webster's law enforcement, investigative, and judicial experience are tailor-made for exemplary IRB service.

Nonetheless, Mr. Burke and Mr. Seltzer raised the concern that questions will be asked by Judge Webster's appointment because he serves on the board of directors of Anheuser–Busch, a large employer of Teamsters. *Id.* at 18, 24. Specifically, Mr. Seltzer stated that he thought it was important that "the IRB be seen as having a proper role by the membership ... [b]ecause no party here should want a nomination and a board appointment to take place that is going to raise questions." *Id.* at 23–24.

Although the implications are clear, neither Mr. Seltzer nor Mr. Burke had the impudence to argue that there would be a conflict of interest or that Judge Webster's impartiality might be compromised. Judge Webster's position on the board of directors of an employer of Teamsters presents no conflict of interest because the IRB has no role in labor-management relations. As a member of the IRB, Judge Webster's mission will be to eradicate corruption in the IBT. Judge Webster is uniquely suited for such service. Moreover, his sterling reputation for integrity and fairness belie any suggestion that his impartiality might be compromised.[5]

---

**4.** Judge Webster's curriculum vitae is attached to this Opinion as Exhibit A.

**5.** It should be noted that if any IRB member, at any time, fails to carry out his or duties responsibly, fairly, and impartially, any of the other

Although Mr. Seltzer professes a concern that questions will be raised by the membership if Judge Webster is appointed to the IRB, Mr. Seltzer ignores the questions raised by the new IBT administration's opposition to the appointment of Judge Webster: If the new IBT administration is truly dedicated to eradicating corruption from the Union, why would it oppose the nomination of someone who will vigorously seek to accomplish this goal? By objecting to Judge Webster's appointment, are Mr. Burke and the IBT administration trying to shield corrupt IBT members from discipline? If IRB members are supposed to act independently, why is Mr. Burke consulting with IBT General President Carey and other unnamed IBT members in the exercise of his duties? Moreover, why is Mr. Seltzer, counsel to the IBT, speaking on Mr. Burke's behalf?

While the new IBT administration has publicly disassociated itself from the prior administration and professed dedication to reform, it has adopted the prior administration's strategy of fighting the agents of reform agreed to in the Consent Decree. "After agreeing that it was 'imperative' to eradicate corruption from the IBT and restore democratic practices to the Union, the prior IBT administration spent $10.5 million on a campaign to eviscerate the mechanisms of reform contained in the Consent Decree to achieve these goals." August 19, 1992 Opinion & Order, 803 F.Supp. 761, 777 (S.D.N.Y.1992). Just as the prior IBT administration advocated a narrow, restrictive interpretation of the Consent Decree to limit the Court–Appointed Officers Authority, stymie their efforts, and delay the implementation of reform, the new IBT administration has advocated a narrow, restrictive interpretation of the Consent Decree to limit the IRB's authority, hamper its ability to function, and delay the beginning of its operation. *Id.* at 42–92. Moreover, the new IBT administration's objection to Judge Webster's appointment to the IRB echoes unmistakably the prior administration's objection to Judge Lacey's appointment as the Independent Administra-

tor. Judge Lacey, who served as United States Attorney for the District of New Jersey and United States District Judge for the District of New Jersey, is a distinguished jurist and practitioner with an unblemished reputation for fairness and integrity. *See* January 17, 1992 Opinion & Order, 782 F.Supp. 243, 251 (S.D.N.Y.1992). Nonetheless, the prior IBT administration opposed Judge Lacey's appointment as the Independent Administrator—no doubt because it was aware that he would vigorously carry out his assigned role under the Consent Decree. Just as the nomination of Judge Lacey for the position of Independent Administrator presented the prior IBT administration with an opportunity to prove its dedication to reform, the nomination of Judge Webster to the IRB presents the current IBT administration with an opportunity to prove its dedication to reform. Rather than busily preparing to welcome Judge Webster—who will undoubtedly carry out his assigned task zealously and fairly—the new IBT administration has busily attempted to construct his tumbrel.

### III. CONCLUSION

The Consent Decree requires the IRB—an independent entity created by the parties to investigate and discipline corruption in the IBT while monitoring IBT attempts to eradicate corruption—to begin operation on October 10, 1992. The impasse between Judge Lacey and Mr. Burke threatened implementation of the Consent Decree because without the third member, the IRB would be unable to operate as agreed by the parties. This Court resolved the impasse by selecting the most qualified candidate for IRB membership nominated by Judge Lacey and by Mr. Burke and the IBT: Judge William H. Webster. Rather than oppose this nomination, one would think that the new IBT administration, which has professed dedication to reform, would welcome his appointment. Despite the IBT administration's stance, the rank-and-file, who have labored for too long in a union where mafia influence and corruption have nurtured an atmosphere of fear and

IRB members or the parties can make applica-     tion to this Court to address the matter.

intimidation, will have a staunch ally in Judge Webster, who will undoubtedly carry out his mission to eradicate corruption in the Union independently, vigorously, wisely, courageously, and fairly.

IT IS HEREBY ORDERED that the application of Judge Lacey and the Government is granted.

IT IS FURTHER ORDERED that Judge William H. Webster will serve as the third member of the Independent Review Board.

IT IS FURTHER ORDERED that this decision is effective immediately.

SO ORDERED.

## EXHIBIT A

*Biography of William H. Webster*

William H. Webster was sworn in as Director of Central Intelligence on May 26, 1987. In this position he headed the Intelligence Community (all foreign agencies of the United States) and directed the Central Intelligence Agency until September 1, 1991.

In September 1991, he joined the law firm of Milbank, Tweed, Hadley & McCloy in its Washington, D.C. office.

William H. Webster was born March 6, 1924, in St. Louis, Missouri, and received his early education in Webster Groves near St. Louis. He was awarded a Bachelor of Arts degree from Amherst College in 1947, where, in 1975, he received an honorary Doctor of Laws degree. Judge Webster received his Juris Doctor degree from Washington University Law School, which is located in St. Louis, Missouri, in 1949. He served as a lieutenant in the United States Navy in World War II and again in the Korean War.

A practicing attorney with a St. Louis law firm from 1949 to 1959, Judge Webster served as United States Attorney for the Eastern District of Missouri from 1960 to 1961. He returned to private practice in 1961. From 1964 to 1969, he was a member of the Missouri Board of Law Examiners.

In 1970, Judge Webster was appointed a Judge of the United States District Court for the Eastern District of Missouri and in 1973 was elevated to the United States Court of Appeals for the Eighth Circuit. He resigned on February 23, 1978 to become Director of the Federal Bureau of Investigation. During his service on the bench, Judge Webster was Chairman of the Judiciary Conference Advisory Committee on the Criminal Rules and was a member of the Ad Hoc Committee on Habeas Corpus and the Committee of Court Administration.

A member of the American Bar Association, the Council of the American Law Institute, the Order of the Coif, the Missouri Bar Integrated, and the Metropolitan St. Louis Bar Association, Judge Webster served as Chairman of the Corporation, Banking and Business Law Section of the American Bar Association, and is a fellow of the American Bar Foundation.

Judge Webster was named Man of the Year 1980, by the St. Louis Globe–Democrat, and in May 1981, received the William Greenleaf Elliot Award from Washington University and the Riot Relief Fund Award in New York City. In October 1982, he was presented the Fordham Law School Louis Stein Award and in August 1983, the International Platform Association Theodore Roosevelt Award for excellence in public service. In June 1984, he received the Jefferson Award for the Greatest Public Service by an Elected or Appointed Official. In May 1985, he was presented the Freedoms Foundation National Service Medal in Valley Forge, Pennsylvania, and the First Annual Patrick V. Murphy Award from the Police Foundation, Washington, D.C., for distinguished service in law enforcement. He was named Father of the Year for Public Service in May 1986 by the National Father's Day Committee, and received the 1986 Thomas Jefferson Award in Law from the University of Virginia. In June 1988, he received the Bracebridge Young Award from the American Society of Corporate Secretaries, and in May 1989, he was presented the Federal City Club's Distinguished Public Service Award. He received the Salees Seddon Criminal Justice Leadership Award in April 1990. On Octo-

820

ber 30, 1990, Judge Webster was presented the Boy Scouts of America Silver Buffalo Award.

On July 1, 1991 Judge Webster was presented the Distinguished Intelligence Medal and on July 25, 1991 he was awarded the Presidential Medal of Freedom and the National Security Medal.

Judge Webster was elected to active membership in the National Academy of Public Administration in October 1981 and served as President of the Institute of Judicial Administration from May 1985 until September 1988.

In 1972, Judge Webster received a Washington University Alumni Citation for contributions to the field of law and, in 1977, received the Distinguished Alumnus Award from Washington University Law School. A member of the University of Colorado Law School Board of Visitors and the National Advisory Board of the American University, Judge Webster holds honorary degrees from Amherst College, DePauw University, William Woods College, Drury College, Washington University, Columbia College, University of Dayton School of Law, University of Notre Dame, Centre College, Dickinson School of Law, University of Miami, DePaul University, the American University, The John Jay College of Criminal Justice, Westminster College, Georgetown University, and Pepperdine University.